ROCHESTER TELEPHONE CORPORATION, Respondent, v VILLAGE OF FAIRPORT et al., Appellants.

Fourth Department, January 22, 1982

**APPEARANCES OF COUNSEL**

*Harris, Beach, Wilcox, Rubin & Levey (Paul R. Braunsdorf* of counsel), for appellants.

*Nixon, Hargrave, Devans & Doyle (Frank H. Penski* and *Thomas E. Reidy* of counsel), for respondent.

**OPINION OF THE COURT**

SIMONS, J. P.

In 1977 defendant Village of Fairport, undertook a Federally funded program to reconstruct and relocate West Church Street and the related water and sewer lines, sidewalks and landscaping. In connection with the project it ordered plaintiff to underground its transmission facilities for the 13 blocks of the reconstruction. Plaintiff did so under protest and it now sues to recover the cost contending the order was an unlawful exercise of the Village's police powers. After a nonjury trial the court agreed, finding that the undergrounding was not included in the reconstruction plans, that it was not a necessary part of the improvement, and that it was ordered by defendant for aesthetic reasons. The parties stipulated that the addi-

tional cost of the relocation to plaintiff was $75,753.96 and the court awarded it judgment in that amount. There should be an affirmance.

■ It is established law that a utility company granted the privilege of maintaining its facilities in public streets must relocate them at its own expense "'whenever the public health, safety or convenience requires the change to be made'" (*Matter of Consolidated Edison Co. of N.Y. v Lindsay,* 24 NY2d 309, 316, quoting *Transit Comm. v Long Is. R.R. Co.,* 253 NY 345, 351, 352). It must do so because the privilege, authorized by statute (see Transportation Corporations Law, § 27; Village Law, § 4-412, subd 3, par [6]), grants the utility no property interest in the right of way, only a license to maintain its facilities there. If the relocation is not necessary to maintain or improve the street conditions, however, the municipality must pay the cost (see *City of New York v New York Tel. Co.,* 278 NY 9, 14; and see *Ashland Oil & Refining Co. v State of New York,* 26 NY2d 390). Stated another way, the municipality must not submit the utility to unnecessary and unreasonable expense when the legitimate exercise of the police power does not require it. And that is this issue here, did defendant's order to plaintiff to underground its facilities go beyond what was reasonable and necessary? Defendant had the power to regulate the use of private property, but the legitimacy of its action depends upon whether the regulation was reasonably required to promote and enhance the public health, safety and convenience for the general police power must always be exercised within the limits of public "necessity" (see *Matter of Belle Harbor Realty Corp. v Kerr,* 35 NY2d 507, 511). If the regulation goes too far, the municipality's action will be treated as a public taking for which compensation is required (see, generally, *Pennsylvania Coal Co. v Mahon,* 260 US 393, 415; *French Investing Co. v City of New York,* 39 NY2d 587, 593-595, app dsmd and cert den 429 US 990; *Lutheran Church in Amer. v City of New York,* 35 NY2d 121, 128-129).

Governmental action, of course, does not always fit within these "theoretically tidy" distinctions (see *Loretto v Teleprompter Manhattan CATV Corp.,* 53 NY2d 124, 157

[COOKE, Ch. J., dissenting]), and although the difference "between a compensable taking and a non-compensable regulation" is definable, it "is not always susceptible of precise demarcation" (*French Investing Co. v City of New York, supra,* p 593). Thus, in several recent cases the Court of Appeals has found it helpful to analyze the problem in this way: "government interference [with the use of private property] is based on one of two concepts — either the government is acting in its enterprise capacity, where it takes unto itself private resources in use for the common good, or in its arbitral capacity, where it intervenes to straighten out situations in which the citizenry is in conflict over land use or where one person's use of his land is injurious to others. (Sax, Takings and The Police Power, 74 Yale L.J. 36, 62, 63.) Where government acts in its enterprise capacity, as where it takes land to widen a road, there is a compensable taking. Where government acts in its arbitral capacity, as where it legislates zoning or provides the machinery to enjoin noxious use, there is simply non-compensable regulation." (*Lutheran Church in Amer. v City of New York, supra,* pp 128-129; see, e.g., *Loretto v Teleprompter Manhattan CATV Corp., supra; Modjeska Sign Studios v Berle,* 43 NY2d 468, 474, app dsmd 439 US 809; *New York Tel. Co. v Town of North Hempstead,* 41 NY2d 691, 697; *French Investing Co. v City of New York, supra,* p 593.) It hardly seems necessary to add that the "taking" may be just as real if the unlawful regulation requires the forced outlay of private funds for the public benefit, as it does here, as it is if the regulation unduly restricts the use of property. In either case, one owner has been singled out to suffer a disproportionate loss because of a condition which is general (see *Matter of Charles v Diamond,* 41 NY2d 318; *Westwood Forest Estates v Village of South Nyack,* 23 NY2d 424). Professor Sax stated it this way: "when an individual or limited group in society sustains a detriment to legally acquired existing economic values as a consequence of government activity which enhances the economic value of some governmental enterprise, then the act is a taking, and compensation is constitutionally required; but when the challenged act is an improvement of the public condition through resolution of

conflict within the private sector of the society, compensation is not constitutionally required" (Sax, Takings and The Police Power, 74 Yale LJ 36, 67).

The village advances two contentions to justify assessing this cost against plaintiff. It contends that the undergrounding was reasonable and necessary for reasons of safety, but alternatively, it urges that even if it was not, the village's police power was lawfully exercised for the aesthetic enhancement of the community.

■ This extensive undergrounding was not required for the public safety. The improvement involved the reconstruction of West Church Street, from the Barge Canal to Main Street, a distance of approximately a mile and extending more than 13 city blocks. Plaintiff had 35 poles in place along the route and only 5 to 8 posed a danger to traffic because they were in or near the reconstructed street. There is no contention that it was impossible or impractical to move them but notwithstanding this limited interference with the reconstruction, the village ordered the undergrounding of all plaintiff's facilities. The only other "safety" consideration the village advances is that aerial transmission lines would "conflict" with trees newly planted along the street. That is a common circumstance on city streets, however. The obligation for protecting the utility lines from the trees and maintaining them rested on plaintiff, not the village, and the location of the utility lines as they existed presented no unusual safety hazards in this respect which required undergrounding. Manifestly then, safety was not the concern which motivated the village. The order to underground was, as several witnesses acknowledged, based on aesthetic considerations.

It is now established that aesthetic factors may be considered in enacting zoning laws. Indeed, although they rate well down in the hierarchy of public purposes, reasonable zoning restrictions may be imposed on private property for aesthetic reasons alone (*Modjeska Sign Studios v Berle,* 43 NY2d 468, 478, *supra; Suffolk Outdoor Adv. Co. v Hulse,* 43 NY2d 483, 490, app dsmd 439 US 808; *People v Stover,* 12 NY2d 462, app dsmd 375 US 42). But zoning is functionally different from activities involving the general police

power. Zoning ordinances represent action by the municipality to mediate the conflicting desires of individual owners in the use of their property and to co-ordinate land uses according to a general plan for community development. They interfere with the free and unrestricted use of private property, but the restriction is warranted because of the reciprocal benefits associated with the common constraints. It is this mutual benefit which justifies the ordinance restrictions, not only those reasonable and necessary for the public health and safety, but also those reasonably related to the less vital aesthetic improvement of the community.

In reconstructing the street, however, the municipality was acting in its enterprise capacity. Concededly, it was necessary to order the relocation of a few poles on West Church Street and, in the eyes of some, it may have been reasonable to order plaintiff to bear the cost of undergrounding the facilities attached to them. It was not reasonable or necessary for either safety or aesthetic reasons, however, to unilaterally order the undergrounding of the facilities carried by all 35 poles. It was done by defendant without any reciprocal benefit to plaintiff not as a matter of regulation but to provide an amenity for beautification of a single-family residential area of the community at plaintiff's expense. No doubt the undergrounding improved the area but the "strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change" (*Pennsylvania Coal Co. v Mahon*, 260 US 393, 416 [HOLMES, J.], *supra*).

Finally, defendant contends that the order was not unreasonable because the cost of undergrounding was lessened by the village's reconstruction work and payment for conduit. Plaintiff did not agree that the undergrounding should be done or to share in the cost of it, however, and if it was unreasonable to compel plaintiff to underground its facilities at its own cost, as we find it was, it is not less so because the village unilaterally decided to assume part of the cost.

The judgment should be affirmed.

CALLAHAN, J. (dissenting). We cannot agree to impose upon the taxpayers of the Village of Fairport the cost to relocate utility lines of the Rochester Telephone Corporation. Such an imposition is contrary to well-established principles of law.

The essential facts are not in dispute. In February of 1977, the Village of Fairport received approval from the Economic Development Administration of the United States Department of Commerce for a grant funding the reconstruction of West Church Street, a major village thoroughfare. The grant was issued under a program designed to combat local unemployment. The village utilized the funds to reconstruct antiquated and deteriorating water supply, sanitary sewer and storm sewer systems as well as curbing, sidewalks and pavements of West Church Street. While there was no provision in the grant for relocation of telephone poles lining West Church Street, the engineering plans for the project provided for the relocation of all aboveground utility lines into underground conduits. It was indicated by the project engineer that these changes were necessary for safety reasons when it was discovered during planning that the widening of various intersections would place some existing telephone poles physically in the streets and others within a close proximity of the curb. Also, there was the probability of a conflict between the utility lines and 112 additional new trees to be planted as part of the project with potential damage to the lines from ice laden branches. Further, the electric company lines sharing use on the existing poles were scheduled to be contained in underground conduits. For these reasons the village board passed a resolution directing Rochester Telephone to locate its lines underground within conduits provided by the urban renewal project.

The majority acknowledge the common-law rule, that utility companies which have been granted the privilege of maintaining their facilities in public streets must relocate them at their own expense "'whenever the public health, safety or convenience requires the change to be made'", remains in effect to the present day (*Matter of Consolidated Edison Co. of N. Y. v Lindsay,* 24 NY2d 309, 316, quoting

*Transit Comm. v Long Is. R.R. Co.,* 253 NY 345, 351, 352; see, also, *New York Tel. Co. v City of Binghamton,* 18 NY2d 152; *New Rochelle Water Co. v State of New York,* 10 NY2d 287; *New York Tel. Co. v State of New York,* 67 AD2d 745, 746; *Pennsylvania & So. Gas Co. v State of New York,* 57 AD2d 166, 167; *Brooklyn Union Gas Co. v City of New York,* 37 AD2d 603, 604). This rule evolves from the fact that a utility gains no property interest in the public right of way beyond a mere privilege, e.g., a franchise or a license to maintain facilities in public streets (see *Ashland Oil & Refining Co. v State of New York,* 26 NY2d 390; *New York Tel. Co. v State of New York, supra,* p 746).

As we view this record, Rochester Telephone failed to prove that it possessed an easement or other vested property right in its existing lines and, accordingly, must be deemed a mere licensee (cf. *New York Tel. Co. v State of New York, supra*). A licensee is not entitled to reimbursement for the cost of relocating its utility lines when the move was required by the public health, safety or convenience; or, put otherwise, when the municipalities' action was a legitimate exercise of the police power (see *Ashland Oil & Refining Co. v State of New York, supra,* p 393; *Matter of Consolidated Edison Co. of N.Y. v Lindsay, supra,* pp 316-317).

The resolution of the Fairport Village Board is a legitimate exercise of its police power reasonably related to a valid subject of legislative concern and is neither arbitrary nor unduly oppressive (see *People v Goodman,* 31 NY2d 262, 266; *Stubbart v County of Monroe,* 58 AD2d 25, 29; see, generally, 40 NY Jur, Municipal Corporations, § 782). Rather we view it as a reasonable exercise of the police power (see *Modjeska Sign Studios v Berle,* 43 NY2d 468, 478, app dsmd 439 US 809; *French Investing Co. v City of New York,* 39 NY2d 587, 595, app dsmd 429 US 990). We can find no basis in this record to support the majority determination that the resolution of the village board resulted in "a public taking".

The majority strain this record to relate the required underground relocation to a "public taking". This case does not raise that sort of issue where compensation is required for a governmental taking of property or even suggest a

case of essentially individualized cost of bearing some public improvement. Use of conduits to house utility lines is not foreign to Rochester Telephone or unique to West Church Street. The record relates that the main trunk line of Rochester Telephone for service to residents east of the village is contained in underground conduits along West Main Street and manholes for their maintenance are located therein for service thereof.

The trial court erroneously granted the utility's request for reimbursement on the theory that the directive for relocating the lines underground was based solely on aesthetic reasons rather than as a matter of public necessity for the public health and safety. The mere fact that relocation of utility lines underground was motivated by aesthetic considerations does not automatically render the village resolution invalid. Sometimes aesthetics alone constitute a valid basis for exercise of the police power (see *Suffolk Outdoor Adv. Co. v Hulse,* 43 NY2d 483, 490, app dsmd 439 US 808; *Modjeska Sign Studios v Berle, supra,* p 478). Aesthetics is a legitimate public purpose and burying the telephone lines underground is reasonably related to that purpose.

We agree, the reasonableness of the means employed must be subjected to a more searching scrutiny when the public purpose is the enhancement of aesthetics (see *Modjeska Sign Studios v Berle, supra,* p 474). In these circumstances the board's decision to order relocation of the utility lines underground was not unreasonable nor unduly oppressive. In the renewal scheme the street was to be excavated with the bulk of expenses, including cost of installing the conduit, being incurred by the village. It is undisputed that the planned construction and improving the intersections and repaving the streets required relocation of all poles within the intersections and all those placed in close proximity to the new curbing. There was also the probability of a hazardous condition developing by virtue of a foreseeable conflict between the remaining telephone lines and additional trees that were to be planted as an integral part of the renewal project. Additionally, other electrical utility lines were to be placed underground. Thus, while aesthetics were undoubtedly an

important consideration for relocating the telephone lines, there were other valid safety and practical considerations as well. Aesthetics were properly considered in the context of the entire project. Accordingly, the board's action in ordering Rochester Telephone to relocate its telephone lines underground along the path of the renewal project cannot be said to be an unreasonable exercise of the police power.

Therefore, the judgment should be reversed, on the law and facts, and judgment directed to be entered in favor of defendants dismissing plaintiff's complaint.

DENMAN and MOULE, JJ., concur with SIMONS, J.P.; CALLAHAN and SCHNEPP, JJ., dissent and vote to reverse the judgment and dismiss the complaint in an opinion by CALLAHAN, J.

Judgment affirmed, with costs.