2003-NMSC-028

79 P.3d 297

**CITY OF ALBUQUERQUE, City of Santa Fe, County of Santa Fe, County of Bernalillo, Santa Fe Northwest Advisory Council, Energy Conscious Homeowner's Organization, Hacienda del Cerezo, Ltd., and Moss Farms L.L.C., Appellants,**

v.

**NEW MEXICO PUBLIC REGULATION COMMISSION and Public Service Company of New Mexico, Appellees,**

and

**New Mexico Industrial Energy Consumers, Intervenor.**

No. 27,527.

Supreme Court of New Mexico.

Sept. 30, 2003.

Rehearing Denied Oct. 29, 2003.

Nann Houliston, Tito D. Chavez, Merry P. Stubblefield, Albuquerque, NM, Robert D. Kidd, Jr., Steven Kopelman, Santa Fe, NM, Margot J. Steadman, Corrales, NM, for Appellants.

Lee W. Huffman, Associate General Counsel, Santa Fe, NM, Carol Smith Rising, Albuquerque, NM, for Appellees.

## OPINION

SERNA, Justice.

{1} The Cities of Albuquerque and Santa Fe and the Counties of Bernalillo and Santa Fe, among others, (collectively, the Local Governments) appeal the approval of a tariff by the New Mexico Public Regulation Commission (PRC) that allows Public Service Company of New Mexico (PNM) to recover costs incurred in complying with any local ordinance to place utility systems underground, including placing new systems underground or converting existing overhead systems to underground systems. The Local Governments raise a number of issues on appeal: (1) the tariff violates the common law rule that utilities bear the expense of relocating lines and facilities as a result of municipal or county improvement projects; (2) the tariff interferes with their police powers by permitting PNM to disregard local ordinances; (3) the tariff violates the principle of separation of powers by exceeding the PRC's statutory authority; (4) the tariff impermissibly results in discriminatory rates;

(5) the tariff violates the anti-donation clause of the New Mexico Constitution; and (6) the tariff violates the Procurement Code. We agree with the Local Governments that the tariff, in its current form, violates the common law rule that permits a municipality to require relocation in certain circumstances at a utility's own expense; however, we believe it is also necessary to address whether the Legislature intended to authorize the PRC to displace the common law rule. On this question, we conclude that the Legislature has not expressed such an intent. Therefore, we conclude that the tariff, as presently drafted, unduly infringes upon the police power of local governments, is inconsistent with the common law rule regarding relocation, and exceeds the PRC's statutory authority because it does not contain an exception that would categorize local improvement projects necessitated by public health and safety as a cost of service. As a result, we vacate the tariff.

## I. Local Police Power and the Common Law of Relocation

{2} "The burden shall be on the party appealing to show that the [PRC] order appealed from is unreasonable, or unlawful." NMSA 1978, § 62-11-4 (1965). The Local Governments contend that the tariff in this case is unlawful because it interferes with their police powers. Before analyzing the tariff, we first discuss the extent of those powers. As we explain in more detail below, while municipalities have the authority to improve or relocate their public ways and the common law recognizes as an aspect of this authority the power to require utilities to bear their costs associated with a street improvement or relocation, the common law rule applies only if the municipal project is required in the interest of public health and safety.

{3} A municipality "is an auxiliary of the state government." *Morningstar Water Users Ass'n v. Farmington Mun. Sch. Dist. No. 5*, 120 N.M. 307, 316, 901 P.2d 725, 734 (1995). Depending on whether they have adopted a charter, municipalities have two potential sources of authority: home rule power and police power. For home rule power, the New Mexico Constitution provides that "[a] municipality which adopts a charter may exercise all legislative powers and perform all functions not expressly denied by general law or charter." N.M. Const. art. X, § 6(D). "The purpose of this section is to provide for maximum local self-government." N.M. Const. art. X, § 6(E); *see Apodaca v. Wilson*, 86 N.M. 516, 521, 525 P.2d 876, 881 (1974) ("[A] home rule municipality no longer has to look to the [L]egislature for a grant of power to act, but only looks to legislative enactments to see if any express limitations have been placed on their power to act."). By contrast, "[i]t is well settled that municipalities have no inherent right to exercise police power; their right must derive from authority granted by the State." *Temple Baptist Church, Inc. v. City of Albuquerque*, 98 N.M. 138, 142, 646 P.2d 565, 569 (1982). Similarly, "[a] county is but a political subdivision of the State, and it possesses only such powers as are expressly granted to it by the Legislature, together with those necessarily implied to implement those express powers." *El Dorado at Santa Fe, Inc. v. Bd. of County Comm'rs*, 89 N.M. 313, 317, 551 P.2d 1360, 1364 (1976); *see* NMSA 1978, § 4-37-1 (1975) ("All counties are granted the same powers that are granted municipalities except for those powers that are inconsistent with statutory or constitutional limitations placed on counties.").

{4} With respect to the particular factual context of this case, utilities "are authorized to place their pipes, poles, wires, cables, conduits, towers, piers, abutments, stations and other necessary fixtures, appliances and structures, upon or across any of the public roads, streets, alleys, highways and waters in this state *subject to the regulation of the county commissioners and local municipal authorities*." NMSA 1978, § 62-1-2 (1909) (emphasis added). Counties and home rule municipalities are authorized to grant franchises to utilities to use public ways within cities and towns for their facilities "provided that such use shall not unnecessarily obstruct public travel." NMSA 1978, § 62-1-3 (1987). Municipalities are further empowered to "lay out, establish, open, vacate, alter, repair, widen, extend, grade, pave or otherwise improve streets" and "regulate their use." NMSA

1978, § 3–49–1 (1967). "The matters relating to the design and location of municipal road projects, if carried out in conformity with applicable law, generally involve policy questions entrusted to the discretion of municipal or public authorities." *City of Albuquerque v. State ex rel. Vill. of Los Ranchos de Albuquerque*, 111 N.M. 608, 614, 808 P.2d 58, 64 (Ct.App.1991).

■■■ {5} Generally, as an incident of a utility's use of municipal streets for its facilities, the utility must defer to the municipality's discretion to alter, improve, or relocate its streets.

> At common law, the right of a utility to use the streets is subject to the right of the municipality to require the utility to relocate its lines and facilities when necessary, because of changes in street locations or improvements, or as otherwise required in the interest of the public health and welfare. In the absence of a valid ordinance or statute to the contrary, such removal of facilities must be accomplished at the expense of the utility.

*S. Union Gas Co. v. City of Artesia*, 81 N.M. 654, 655, 472 P.2d 368, 369 (1970). We reject the PRC's argument that this common law rule does not apply to undergrounding. A utility locates its facilities above, on, or under a public way "at the risk that they might be, at some future time, disturbed, when the [governmental authority] might require for a necessary public use that changes in location be made," and a municipality's police power in this regard extends "to the subsurface of the streets, which, no less than the surface, is primarily under public control." *New Orleans Gaslight Co. v. Drainage Comm'n*, 197 U.S. 453, 461, 25 S.Ct. 471, 49 L.Ed. 831 (1905).

■■■ {6} Nonetheless, as the City of Albuquerque recognized in its arguments to the hearing examiner below, this common law rule of requiring utilities to relocate at their own expense extends only to improvements or municipal projects undertaken out of public necessity. *See* 12 Beth A. Buday & Dennis Jensen, *The Law of Municipal Corporations* 34.74.10, at 224 (3d ed., rev.1995) ("The fundamental common-law right applicable to franchises in streets is that the utility company must relocate its facilities in public streets when changes are required by public necessity.") [hereinafter *The Law of Municipal Corporations* ]. "[I]f the relocation is not necessary to maintain or improve street conditions, the municipality must pay the costs." *Id.* at 225. Although "aesthetic considerations alone do justify the exercise of police power," *Temple Baptist Church*, 98 N.M. at 144, 646 P.2d at 571; *see* 3–49–1(C) (authorizing municipalities to provide for "beautification" of streets), a municipal improvement project that is based on aesthetics rather than public health and safety will not trigger the common law rule of requiring utilities to bear the expense of relocation. *N. States Power Co. v. City of Oakdale*, 588 N.W.2d 534, 542 (Minn.Ct.App.1999) ("We decline the invitation to extend the law with respect to municipal regulation of public utilities [for aesthetic or convenience considerations only], and instead apply the more traditional public interest tests of public health, safety, and general welfare."); *accord Rochester Tel. Corp. v. Vill. of Fairport*, 84 A.D.2d 455, 446 N.Y.S.2d 823, 826 (1982). *See generally State ex rel. City of Albuquerque v. Lavender*, 69 N.M. 220, 227, 365 P.2d 652, 657 (1961) (noting the relevance of takings considerations in the context of relocation); *Redev. Auth. v. Woodring*, 498 Pa. 180, 445 A.2d 724, 727–28 (1982) (affirming a finding of a de facto taking for an undergrounding ordinance motivated by aesthetics).

■■■ {7} Moreover, a home rule municipality's power to legislate is subject to limitation by the Legislature. N.M. Const. art. X, § 6(D); *see Casuse v. City of Gallup*, 106 N.M. 571, 573, 746 P.2d 1103, 1105 (1987) ("[A]ny New Mexico law that clearly intends to preempt a governmental area should be sufficient without necessarily stating that affected municipalities must comply and cannot operate to the contrary."). Local governments also cannot use their police power over street improvements or their home rule power to frustrate or violate established public policy. *Cf. ACLU v. City of Albuquerque*, 1999–NMSC–044, ¶ 13, 128 N.M. 315, 992 P.2d 866 ("To allow municipalities to criminalize the otherwise lawful behavior of children remaining on public streets during cur-

few hours, or to characterize any act of a child as criminal, as opposed to delinquent, would circumvent and thereby frustrate the Legislature's intent to protect children and uniformly enforce laws of a penal nature against them.").

{8} These principles are relevant in the present case because "ratemaking is a matter of statewide rather than local concern" and the PRC "retains plenary authority over ratemaking," *City of Albuquerque v. N.M. Pub. Serv. Comm'n,* 115 N.M. 521, 530, 854 P.2d 348, 357 (1993).

> Enacted in 1941, the [New Mexico Public Utility Act] significantly changed the method of public utility regulation in New Mexico. Prior to that year, New Mexico had followed a localized scheme of regulation, with individual municipalities possessing the authority to regulate public utilities....
>
> The PUA abolished this localized regulatory scheme and established a statewide, centralized regulatory system.

*Id.* at 527, 854 P.2d at 354 (footnote omitted). "[B]ecause ratemaking inevitably affects the financial health of a public utility, the utility's rates are always a matter of statewide concern, at least when a utility serves more than one municipality in the state." *Id.* at 530, 854 P.2d at 357. As a result, local governments cannot create the equivalent of a statewide policy governing utilities or use their police power in a manner that will detrimentally affect utility rates for the State as a whole. *See Duquesne Light Co. v. Borough of Monroeville,* 449 Pa. 573, 298 A.2d 252, 256 (1972) (concluding that the public utility commission has approval power over local undergrounding ordinances and "ultimate authority to determine the particulars of implementation, including timing, feasibility and cost of the project"); *Gen. Tel. Co. of Nw v. City of Bothell,* 105 Wash.2d 579, 716 P.2d 879, 884 (1986) (en banc) ("[A] municipality cannot, under the guise of police regulations, usurp the functions of a state public service commission."); *see also City of Albuquerque,* 115 N.M. at 530, 854 P.2d at 357 ("[A] proposed service rate for one municipality can affect rates to other municipalities in the state."). "A home rule municipality may not usurp the Commission's authority to regulate pursuant to Article XI...." *Las Cruces TV Cable v. N.M. State Corp. Comm'n (In re Generic Investigation into Cable Television Servs.),* 103 N.M. 345, 351, 707 P.2d 1155, 1161 (1985). Thus, any undergrounding requirement by local governments cannot unduly interfere with the Legislature's declared public policy of ensuring "that reasonable and proper [utility] services ... be available at fair, just and reasonable rates," NMSA 1978, § 62–3–1(B) (1967). *Cf. Las Cruces TV Cable,* 103 N.M. at 351, 707 P.2d at 1161 ("Although the regulatory authority at issue is not specifically denied to home rule municipalities by Article XI, the grant of the authority to the Commission makes its exercise by any other governmental body so inconsistent with the Constitution that it is equivalent to an express denial."). *See generally State ex rel. Haynes v. Bonem,* 114 N.M. 627, 632, 845 P.2d 150, 155 (1992) ("[I]n order for a statute to override an enactment of a home rule municipality, the statute must relate to a matter of statewide concern."); 12 *The Law of Municipal Corporations, supra,* 34.72, at 215 ("[T]he public improvement must not unnecessarily interfere with the rights of the grantee of the franchise.").

{9} Additionally, local governmental authority is more specifically limited with respect to public highways. In this context, the Legislature has determined that it is "in the public interest to provide for the orderly and economical relocation of utilities when made necessary by ... highway improvements, including extensions thereof within urban areas." NMSA 1978, § 67–8–15(A) (1959). The Legislature recognized that "[u]tilities have been authorized by statute for many years to locate their facilities within the boundaries of public roads and streets in this state; ... utilities are subject to extensive regulation by state agencies[,] and they are affected with the public interest...." Section 67–8–15(B). The Legislature also noted that "all persons in this state are actual or potential consumers of one or more utility services, and all consumers will be affected by the cost of relocation of their utilities as necessary to accommodate high-

way improvements." Section 67–8–15(B)(4). As a result, the Legislature has declared as the public policy of this State,

> Public highways are intended principally for public travel and transportation; but they are also intended for proper utility uses in serving the public, as authorized pursuant to the laws of this state, and such utility uses are for the benefit of the public served. Without making use of public ways utility lines could not reach or economically service the adjacent public, particularly in urban areas.

Section 67–8–15(B). "Utility relocations necessitated by construction of public highways or improvements thereto are a public governmental function, properly a part of such construction and to the extent in this act provided such relocations shall be made at state expense...." Section 67–8–15(E). This public policy applies to " 'public highways,' " which are defined in part as "state highway[s] or other public way[s] in this state, including extensions thereof within urban areas, constructed in whole or in part with state aid." NMSA 1978, § 67–8–16(D) (1959).

{10} The Legislature delegated the power to "provide for the relocation of utility facilities within a public highway" to the State Highway and Transportation Department. NMSA 1978, § 67–8–17(A) (1959).[1] The Department may provide for relocation "upon a finding that the action provided for is necessitated by highway improvement." Section 67–8–17(A). The Legislature directed the Department "to promote the public interest in the highway improvement without undue cost or risk and without impairment of utility service." *Id.* With respect to these statutes, we have previously noted that "a proper balancing of the benefits to be obtained by the exercise of the state's police power in requiring the relocations of utilities at the sole expense of the owners thereof, as opposed to the burdens, fully justifies the expenditure of public monies for the purpose of doing equity." *Lavender*, 69 N.M. at 234, 365 P.2d at

662. It is clear that the Legislature intended these statutes to be preemptive on the subject of relocation costs. Therefore, local governments are precluded from altering this legislative scheme by requiring undergrounding at the utility's expense on any roads falling within the definition of "public highway" in Section 67–8–16(D).

■ {11} As these principles demonstrate, local governments possess the authority to require a utility to relocate its facilities at the utility's expense as a result of street improvement or urban renewal projects, *S. Union Gas Co.*, 81 N.M. at 655–56, 472 P.2d at 369–70, but the common law rule of imposing the expenses of relocation on the utility applies only if the improvement project is necessitated by public health and safety. In addition, neither the improvement project nor the imposition of relocation expenses on the utility may interfere with established public policy on matters of statewide concern. Against this background, we now address the Local Governments' contention that the tariff is inconsistent with local police powers and the common law rule of relocation.

## II. The Tariff

■ {12} In its final order, the PRC adopted PNM's proposed underground system special services rate, labeled as Rate No. 22. Rate 22 applies "to any Local Government ... that requires the installation of an Underground System instead of a new Overhead System or conversion of an existing Overhead System to an Underground System and to the Local Customers of [PNM] located within the jurisdiction of such a Local Government." The rate provides for PNM to recover the cost of undergrounding required by local ordinance in one of three ways: (1) from the local government directly through a written agreement with PNM; (2) from the customers receiving service from PNM within the local government's jurisdictional boundaries through a rate rider approved by the PRC; or (3)

---

1. Although Section 67–8–16(C) defines " 'commission' " as "the state highway commission," the Legislature elsewhere provided that "[a]ll references contained in the NMSA 1978, as amended, and which refer to the 'state highway commission' or 'commissioners' shall, wherever appropriate, be construed to refer to or to mean the state highway and transportation department as designated in this section." NMSA 1978, § 67–3–6 (1987).

from a combination of the first and second recovery methods. "Under this Schedule, the Excess Costs of the Underground System project will be the responsibility of the Local Government pursuant to the terms of the agreement between [PNM] and the Local Government or will be the responsibility of the Local Customers pursuant to the terms of a rate rider approved by the [PRC] as described in this Schedule." Rate 22 further provides that PNM "will not procure materials or commence construction of an Underground System unless the Local Government agrees in writing to pay the Excess Costs of such project or the [PRC] approves a rate rider providing for the recovery of the Excess Costs from the Local Customers." In addition to the recovery of costs associated with undergrounding, PNM designed Rate 22 "to protect PNM's ratepayers located outside the limits of the Local Government's jurisdiction from paying the Excess Costs for underground placement of power line facilities in a location outside their area."

{13} Rate 22, by its terms, does not apply to projects covered by PNM's existing, approved line extension policy, and it excludes undergrounding of lines with voltages higher than the PRC's definition of distribution voltages. Otherwise, however, Rate 22 applies to all local ordinances requiring the undergrounding of PNM's facilities. This includes undergrounding for purposes of health and safety, as well as for other reasons, such as aesthetics or convenience. It also includes undergrounding based on isolated improvement projects, as well as blanket undergrounding policies.

■ {14} Because of its broad application, Rate 22 has the effect of treating undergrounding due to safety differently from other safety costs incurred by PNM. Typically, prudently incurred costs associated with the safety of utility facilities are considered to be a necessary and beneficial part of utility service for ratepayers. *See* Charles F. Phillips, Jr., *The Regulation of Public Utilities* 506 (2d ed. 1988) ("The type of equipment which a utility uses is directly related to the cost of providing service. And higher safety and/or environmental standards will usually result

in higher costs...."). As a result, safety costs are categorized as a cost of service and are paid by all ratepayers. *See Zia Natural Gas Co. v. N.M. Pub. Util. Comm'n (In re Petition by Zia Natural Gas Co.)*, 2000–NMSC–011, ¶ 13, 128 N.M. 728, 998 P.2d 564 ("[T]he Commission has an obligation to allow a utility expenses that are necessary in providing utility service, that benefit ratepayers, and that are prudently incurred."); *see also* Phillips, *supra,* at 506 ("[A]n increase in service or safety results in a rise of a utility's costs, and higher rates must be charged."). However, by failing to exclude safety-related undergrounding costs, Rate 22 requires that the full amount of these safety-related costs be paid by the particular locality responsible for them, either through a contract with the local government or through a rate rider charged to local customers. We believe that this requirement conflicts with the common law rule permitting municipalities to require PNM to bear the cost of undergrounding due to safety concerns. Under the common law rule, municipalities cannot be required to pay directly the costs of safety-related undergrounding, such as through the contract recovery provision in Rate 22. The fact that Rate 22 provides municipalities the option to decline to enter into a contract with PNM does not eliminate a conflict with the common law rule. If a municipality declines the contract option, PNM will seek a rate rider to charge the customers residing in the locality. Thus, the rate rider option in Rate 22, which imposes the costs of undergrounding only on local customers, indirectly accomplishes precisely what the common law rule prevents, that is, imposing safety-related relocation costs on the municipality requiring them. Even though the tariff provides municipalities the option to reject a contract with PNM, we hold that the common law rule cannot be circumvented by permitting the utility to recover safety-related relocation costs directly from local customers through a rate rider. The common law rule contemplates that relocation costs necessitated by public health and safety be treated as a cost of service paid by all ratepayers. Because Rate 22 applies to all local undergrounding projects, and does not exclude projects required in the interests of health and safety,

we conclude that it violates the common law principle of permitting municipalities to require the utility to bear its own relocation expenses.

{15} Although Rate 22 does not include an exception for local improvements that are required in the interest of public health and safety, the PRC argues to this Court that local governments would be able to petition for an exception to the requirements of Rate 22 for projects based on health and safety. The PRC relies upon NMSA 1978, § 62–10–1 (1941), which allows municipalities and affected persons to file a complaint with the PRC on the ground that a rate "is in any respect unfair, unreasonable, unjust or inadequate." However, the PRC's argument overlooks the hearing examiner's decision and the PRC's final order. The hearing examiner specifically determined that

> [a]n exemption and variance section should be added to allow the [PRC], on a case by case basis, to determine if a particular undergrounding project promotes the health, safety and welfare of the public in general rather than just for a particular locality. The [PRC] should be able to consider if the public interest dictates that the Excess Costs should be a cost of service matter for such unusual projects.

The hearing examiner drafted an "Exemption and Variances" section and concluded that Rate 22 should be approved as just and reasonable with the addition of this section. In its final order, the PRC concluded: "The provision relating to exemptions and variances described by the Hearing Examiner ... is not adopted ... because of the principle that those who impose costs should bear them." Thus, even if the Local Governments could seek an exception in accordance with Section 62–10–1, the PRC, having already resolved the question in this case and determined that "those who impose costs should bear them," would have no reason to "find[ ] probable cause for said complaint" or to deem a hearing on the requested exception "necessary or appropriate" under Section 62–10–1. Indeed, in this case, the City of Albuquerque opposed Rate 22 based on its position that undergrounding for health, safety, and welfare benefits all ratepayers and, thus,

all ratepayers should bear the cost equally as a cost of service. The City of Albuquerque argued that the PRC could determine whether a local undergrounding requirement was based on health and safety or on aesthetics and that, in the case of the latter, local governments would pay the cost of undergrounding. Therefore, despite the PRC's position in this Court that local governments could seek a variance for projects based on health and safety, the final order adopting Rate 22 implicitly provides to the contrary. We conclude that Rate 22 is inconsistent with the common law of relocation.

### III. The PRC's Legislative Rulemaking Authority

{16} The parties appear to assume that an inconsistency between the tariff and the common law rule would necessarily result in vacating the PRC's order. However, we believe that general principles of administrative law make this a more complex question. As explained above, local police power and municipal home rule are subject to the limitations imposed by the Legislature. Similarly, the Legislature, as the policy-making branch of government, can alter or abrogate the common law, as it has done with respect to the common law of relocation for public highways. *See Torres v. State*, 119 N.M. 609, 612, 894 P.2d 386, 389 (1995) ("With deference always to constitutional principles, it is the particular domain of the [L]egislature, as the voice of the people, to make public policy."). It is also true that "[a]n act of an administrative agency which is authorized by the [L]egislature has the force and effect of law." *Costain v. State Regulation & Licensing Dep't*, 1999–NMCA–119, ¶ 7, 128 N.M. 68, 989 P.2d 443; *accord City of Las Cruces v. Pub. Employee Labor Relations Bd.*, 1996–NMSC–024, 121 N.M. 688, 690, 917 P.2d 451, 453 ("Although Section 1.17 is a 'regulation' promulgated by an administrative board, its status as a regulation in no way diminishes the legal force of its provision."). "The separation of powers doctrine directs administrative agencies to their duty of implementing legislation. The Legislature grants agencies the discretion of promulgating rules and regulations which have the force of law." *Duke City Lumber Co. v.*

*N.M. Envtl. Improvement Bd.*, 101 N.M. 291, 292, 681 P.2d 717, 718 (1984). Whereas, with judicially-enforced statutory schemes, "[t]he common law fills in gaps not addressed by a statute," *Sims v. Sims,* 1996–NMSC–078, ¶ 23, 122 N.M. 618, 930 P.2d 153, it is presumed, in the context of administrative matters that the Legislature has delegated to an agency, that the Legislature intended for the agency to interpret legislative language, in a reasonable manner consistent with legislative intent, in order to develop the necessary policy to respond to unaddressed or unforeseen issues. *See Morningstar Water Users Ass'n v. N.M. Pub. Util. Comm'n,* 120 N.M. 579, 583, 904 P.2d 28, 32 (1995) ("When an agency that is governed by a particular statute construes or applies that statute, the court will begin by according some deference to the agency's interpretation.... The court should reverse if the agency's interpretation of a law is unreasonable or unlawful."); *see also Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."). "[T]he judicial deference to be accorded a legislative rule is a strong form of deference attributable to the fact that the agency is exercising legislative power...." 1 Richard J. Pierce, Jr., *Administrative Law Treatise* 6.4, at 334 (4th ed.2002).

Judges are not experts in the field, and are not part of either political branch of the Government. Courts must, in some cases, reconcile competing political interests, but not on the basis of the judges' personal policy preferences. In contrast, an agency to which [the legislative branch] has delegated policymaking responsibilities may, within the limits of that delegation, properly rely upon the incumbent administration's views of wise policy to inform its judgments. While agencies are not directly accountable to the people, the Chief Executive is, and it is entirely appropriate for this political branch of the Government to make such policy choices—resolving the competing interests which [the legislative branch] itself either inadvertently did not resolve, or intentionally left to be resolved by the agency charged with the administration of the statute in light of everyday realities.

*Chevron,* 467 U.S. at 865–66, 104 S.Ct. 2778; *see Torres,* 119 N.M. at 612, 894 P.2d at 389 ("The judiciary ... is not as directly and politically responsible to the people as are the legislative and executive branches of government."). This reasoning is even more compelling for agencies like the PRC, which is composed of elected officials directly accountable to the people. *See* N.M. Const. art. XI, § 1.

{17} Based on these principles, "[w]here an agency has the authority to act, its rules and regulations have the binding effect of statutes and may accordingly alter the common law." *In re A Declaratory Ruling by the N.C. Comm'r of Ins.,* 134 N.C.App. 22, 517 S.E.2d 134, 140 (1999); *accord* 1 Pierce, *supra,* § 6.4, at 325 ("[C]ourts must uphold a legislative rule as long as it represents a valid exercise of agency authority."). We must determine, then, whether Rate 22 is a legislative rule and whether the Legislature delegated to the PRC the authority to modify the common law of relocation. *See In re Howes,* 1997–NMSC–024, 123 N.M. 311, 320, 940 P.2d 159, 168 (per curiam) ("For regulations issued by an agency to have the force of law, they must be promulgated pursuant to statutory authority. While the grant of authority need not be specific, a reviewing court must 'reasonably be able to conclude that the grant of authority contemplates the regulations issued.' ") (citation omitted) (quoting *Chrysler Corp. v. Brown,* 441 U.S. 281, 308, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979)).

{18} The PRC is a constitutional body having the power to regulate public utilities "in such manner as the [L]egislature shall provide." N.M. Const. art. XI, § 2.

The commission shall have general and exclusive power and jurisdiction to regulate and supervise every public utility in respect to its rates and service regulations and in respect to its securities, all in accordance with the provisions and subject to the reservations of the Public Utility Act, and to do all things necessary and conve-

nient in the exercise of its power and jurisdiction.

NMSA 1978, § 62–6–4(A) (2000). Rate 22 falls within the Legislature's definition of a "rate." *See* NMSA 1978, § 62–3–3(H) (1998) (defining " 'rate' " as "every rate, tariff, charge or other compensation for utility service rendered or to be rendered by a utility and every rule, regulation, practice, act, requirement or privilege in any way relating to such rate, tariff, charge or other compensation and any schedule or tariff or part of a schedule or tariff thereof"). We recognize that some courts have held that tariffs filed by a utility and accepted by a utility commission are not capable of modifying the common law of relocation. *U S W. Communications, Inc. v. City of Longmont,* 948 P.2d 509, 517 (Colo.1997) (en banc) ("A contrary tariff ... does not come within the limited situations ... that change the common law and free a utility from its responsibility to pay for relocation."); *Bell Atlantic-Maryland, Inc. v. Md. Stadium Auth.,* 113 Md.App. 640, 688 A.2d 545, 552 (Ct.Spec.App.1997) ("The common law rule requires that the legislature must reverse the common law rule. A tariff is not the act of a legislative body, but a rate or charge that a public utility seeks for its services."). However, we believe this authority is inapposite. Rate 22 is an expression of public policy adopted by the PRC upon a full hearing that was accompanied by notice, an opportunity to be heard, and full participation of affected persons and governmental institutions; it is not merely a schedule filed by a utility, *see* NMSA 1978, § 62–8–3 (1941). In addition, as noted above, the Legislature specifically delegated the exclusive authority to regulate a utility's rates to the PRC and explicitly recognized that a tariff is included within this ratemaking authority. *See* § 62–6–4(A); § 62–3–3(H); *see also Attorney Gen. v. N.M. State Corp. Comm'n (In re Rates & Charges of U S W. Communications, Inc.),* 121 N.M. 156, 164, 909 P.2d 716, 724 (1995) ("Tariffs are documents filed by the regulated utility with the Commission, detailing the rates to be charged for services. Once approved by the Commission, the tariffs become law."). Therefore, Rate 22 is a legisla-

tive rule that is entitled to judicial deference if it is within the scope of the power delegated to the PRC by the Legislature. *See City of Bothell,* 716 P.2d at 884 ("[A] city's right to enact police power regulations in a given area ceases when the [utility commission] passes a general law concerning the same area and concurrent jurisdiction is not possible. [The] undergrounding tariff was valid and pursuant to express [commission] authority.") (footnote omitted); *see also City of Auburn v. Qwest Corp.,* 260 F.3d 1160, 1168 (9th Cir.2001) ("It is true that a tariff properly filed and authorized by law can alter the common law, at least between a utility and its customers."), *cert. denied,* 534 U.S. 1079, 122 S.Ct. 809, 151 L.Ed.2d 694 (2002); *Satellite Sys., Inc. v. Birch Telecom of Okla., Inc.,* 2002 OK 61, ¶ 10, 51 P.3d 585, 589 (Okla. 2002) ("The Commission is vested with authority to guard the public's interest with regard to utility rates. Commission rules, including tariffs, adopted pursuant to this grant of authority are legislative rules limited by the grant of authority.") (footnote omitted).

{19} The Legislature has specifically provided that the PRC may review local land use laws affecting utilities to determine whether they are "unreasonably restrictive and compliance with the regulation is not in the interest of the public convenience and necessity." NMSA 1978, § 62–9–3(G) (2001). If the PRC believes that a local ordinance might be unreasonably restrictive, "it shall promptly serve notice of that fact by certified mail upon the agency, board or commission having jurisdiction for land use of the area affected ... and shall give it an opportunity to respond to the issue." *Id.* To the extent that the PRC finds the regulation to be unreasonably restrictive, it "shall be inapplicable and void as to the siting." *Id.* "The judgment of the commission shall be conclusive on all questions of siting, land use, aesthetics and any other state or local requirements affecting the siting." *Id.* The Legislature thus contemplated that the PRC would have considerable oversight with respect to local land use ordinances directed at public utilities.[2]

---

**2.** We recognize that this specific authority for

location control by the PRC is directed at "new

{20} Nonetheless, oversight authority is different from exclusive or preemptive power. The Legislature has specifically provided that municipalities and counties have the power to regulate the use of public ways for utility facilities. Sections 62–1–2 to –3. We presume that the Legislature was aware of the existing common law of relocation at the time that it recognized this authority for local governments. *See Sims,* 1996–NMSC–078, ¶ 24, 122 N.M. 618, 930 P.2d 153 ("In relying upon the common law to resolve statutory omissions and ambiguities, we presume the [L]egislature was well informed about the existing common law before the statute was enacted and did not intend to enact a statute that conflicted with the common law."). Based on the Legislature's recognition of local governmental authority, we believe that the Legislature intended not to displace the common law of relocation. *See id.* ("If no aspect of the background of law is clearly abrogated, it is presumed to be consistent with, if not incorporated into, new legislation."). This conclusion is reinforced by the Legislature's detailed treatment of relocation costs for improvements of public highways. *See Rutherford v. Darwin,* 95 N.M. 340, 343, 622 P.2d 245, 248 (Ct.App.1980) ("[G]eneral and comprehensive legislation, prescribing minutely a course of conduct to be pursued and the parties and things affected, and specifically describing limitations and exceptions, is indicative of a legislative intent that the statute should totally supersede and replace the common law dealing with the subject matter.") (quoted authority omitted).

{21} In Section 62–9–3(G), the Legislature specifically expressed the manner in which the PRC could review local land use regulations and the findings necessary to declare a local ordinance void. Based on these explicit statutory guidelines, we further believe that the Legislature intended to empower the

PRC to modify the common law of relocation only for local regulations deemed unreasonable within the meaning of Section 62–9–3(G). *See Bettini v. City of Las Cruces,* 82 N.M. 633, 635, 485 P.2d 967, 969 (1971) ("Where authority is given to do a particular thing and a mode of doing it is prescribed, it is limited to be done in that mode; all other modes are excluded. This is a part of the so-called doctrine of expressio unius est exclusio alterius.") (quotation marks and quoted authority omitted).

{22} In this case, the PRC did not find any particular local undergrounding ordinance to be unreasonable. *But cf. Commonwealth Elec. Co.,* 117 Pub. Util. Rep. 4th (PUR) 37, 51, 1990 WL 488918 (Mass. Dep't of Pub. Utils.1990) (determining that undergrounding "would result in higher costs, decreased reliability, and adverse environmental impacts"); *Wis. Pub. Serv. Corp. v. Town of Sevastopol,* 105 Pub. Util. Rep. 4th (PUR) 45, 46–47, 1989 WL 418476 (Wis. Pub. Serv. Comm'n 1989) (finding an undergrounding ordinance to be unreasonable and noting that "[t]he proliferation of [undergrounding] ordinances ... would intolerably interfere with the orderly statewide planning, certification, and construction of necessary public utility projects"). Instead, the PRC sought to preempt all local regulations that imposed the cost of undergrounding on PNM, including local improvement projects necessitated by health and safety. Absent a finding of unreasonableness, the PRC lacked authority to modify the common law rule that permits municipalities to require that utilities bear the expense of relocation for such improvement projects. Therefore, we conclude that the tariff, as adopted, is *ultra vires* because it lacks an exception for reasonable local improvement projects necessitated by public health and safety. Rate 22 constitutes an unlawful infringement upon the power of lo-

plants, facilities and transmission lines," Section 62–9–3(A), and that "[n]o approval shall be required ... for additions to or modifications of an existing plant or transmission line," Section 62–9–3(D). Rate 22 broadly applies to all distribution-voltage transmission lines affected by a local undergrounding ordinance. As a result, it is unnecessary for us to explore the scope of this statute in detail or address whether, under Section 62–6–4(A), the PRC has the power to review

the reasonableness of local ordinances affecting utility facilities that are outside the scope of Section 62–9–3(A). It is sufficient for our resolution of this case to note that the Legislature intended for the PRC to have significant location control authority and also that the Legislature contemplated that the PRC could override local land use ordinances only after a finding of unreasonableness.

cal governments to regulate PNM's use of public ways, as recognized by the Legislature, and we hold that Rate 22 must be vacated.

## IV. Remaining Arguments

{23} Because the tariff is unlawful, we must vacate it. *See* NMSA 1978, § 62–11–5 (1982) ("The supreme court shall have no power to modify the action or order appealed from, but shall either affirm or annul and vacate the same."). "However, we are not precluded from declaring or determining that parts of a Commission order are unlawful ... but at the same time declaring other parts of the order to be reasonable and lawful." *Hobbs Gas Co. v. N.M. Pub. Serv. Comm'n*, 115 N.M. 678, 680, 858 P.2d 54, 56 (1993). Therefore, we address the Local Governments' remaining arguments in order to provide guidance to the PRC on remand.

{24} The Local Governments contend that Rate 22 impermissibly assesses different rates for different communities, relying upon the following legislative directive: "No public utility shall establish and maintain any unreasonable differences as to rates of service either as between localities or as between classes of service." NMSA 1978, § 62–8–6 (1993). The Local Governments had the burden of demonstrating to the PRC that the rates were discriminatory and must show in this Court that the PRC's finding on the issue of discrimination is arbitrary and capricious or not supported by substantial evidence. *See Int'l Minerals & Chem. Corp. v. N.M. Pub. Serv. Comm'n*, 81 N.M. 280, 283–84, 466 P.2d 557, 560–61 (1970). We have previously noted that Section 62–8–6 "does not prohibit variations in rates, nor does it require 'equal service.' Rather, it prohibits 'unreasonable differences' in rates of service between localities. Section 62–8–6 thus forbids arbitrary variations in rates, while permitting variations due to differing costs of service to different areas." *City of Albuquerque*, 115 N.M. at 531, 854 P.2d at 358.

{25} In this case, PNM sought to recover undergrounding costs from the customers located within the jurisdiction requiring the undergrounding. The PRC Staff's expert testified that a cost of service recovery mechanism, which spreads the costs of undergrounding to all ratepayers, would encourage local governments to require undergrounding based on the knowledge that the costs would be paid primarily by customers located beyond an individual local government's boundaries. A cost of service recovery mechanism, then, could effectively lead to a statewide system of undergrounding based on local, piecemeal implementation rather than a statewide policy adopted by either the Legislature or the PRC. Staff's expert further testified that the benefits of undergrounding are largely aesthetic, that "[t]he proposed tariff is designed to insulate ratepayers located outside a local government's jurisdiction from paying the excess costs associated with undergrounding power facilities," and that Rate 22 "is consistent with the goal of rate design that rates should exhibit fairness in the apportionment of costs such that those who are the originators of a certain cost will be liable for such cost." The hearing examiner noted, based on testimony by PNM's expert, that undergrounding, or converting overhead systems to underground, could cost ten times more than overhead systems. *See Wis. Pub. Serv. Corp.*, 105 Pub. Util. Rep. 4th (PUR) at 46 (noting that undergrounding increases costs "by a factor of 10 to 20"). We conclude that the PRC did not adopt an arbitrary variation in rates; the PRC attempted to impose the costs of undergrounding on the customers directly benefitting from the service, such that the variation in rates would reflect differing costs of service. *Cf. City of Longmont*, 948 P.2d at 527 (Kourlis, J., dissenting) ("Requiring ratepayers statewide to subsidize the cost of [a municipality's] relocation effects a rate discrimination in favor of [the municipality's] citizens.... [T]here is the possibility that less affluent communities could be forced to subsidize their more affluent counterparts."). In *Lavender*, the Legislature analogously determined that the common law would result in certain utility users paying a disproportionate share of relocation costs, and we deferred to a legislative scheme that resulted in "a legitimate and equitable apportionment" of those costs. 69 N.M. at 232–33, 365 P.2d at

660–61. Thus, we reject the Local Governments' argument.

{26} The Local Governments alternatively base their claim of discriminatory rates on the assertion that Rate 22 has a negative impact on some smaller communities because PNM does not have a billing mechanism that would allow the use of a rate rider for customers in those areas. However, the PRC adopted the hearing examiner's determination that there was no evidence of any local government served by PNM for which the rate rider would not be feasible. This finding is supported by substantial evidence in the record. PNM's expert testified that the rate rider would be available in all of the local governments covered by the tariff. Therefore, we conclude that the Local Governments failed to carry their burden of showing unreasonable discrimination in rates.

{27} The Local Governments also contend that Rate 22 violates the anti-donation clause of the New Mexico Constitution: "Neither the state nor any county, school district or municipality, except as otherwise provided in this constitution, shall directly or indirectly lend or pledge its credit or make any donation to or in aid of any person, association or public or private corporation...." N.M. Const. art. IX, § 14 (as amended 2002). This argument has been specifically rejected by this Court on a previous occasion. In *Lavender,* we held that the State's reimbursement for relocation costs did not constitute a donation within the meaning of Article IX, Section 14, and we overruled prior authority, *State Highway Comm'n v. S. Union Gas Co.,* 65 N.M. 84, 332 P.2d 1007 (1958), that had held to the contrary. *Lavender,* 69 N.M. at 227–36, 365 P.2d at 657–63. *See generally Hotels of Distinction W., Inc. v. City of Albuquerque,* 107 N.M. 257, 259, 755 P.2d 595, 597 (1988) ("The antidonation clause is not violated by an expenditure of municipal funds for public purposes on public property."). We conclude that Rate 22 does not violate Article IX, Section 14 of the New Mexico Constitution.

{28} Finally, the Local Governments argue that Rate 22 violates the Procurement Code, NMSA 1978, §§ 13–1–28 to –199 (1984, as amended through 2001), because it does not provide for the seeking of bids by local governments. We agree with the PRC, however, that Rate 22 falls within a specific statutory exception to the Procurement Code, NMSA 1978, § 13–1–98(D) (2001) (providing that the Procurement Code does not apply to "purchases of publicly provided or publicly regulated gas, electricity, water, sewer and refuse collection services"). We reject the Local Governments' argument that this exception applies only to the purchase of services and not the purchase of facilities. *See* 62–3–3(I) (defining " 'service' " as "every rule, regulation, practice, act or requirement relating to the service *or facility* of a utility") (emphasis added).

## V.  Conclusion

{29} We conclude that, because of its over-inclusive application to local governmental improvement projects necessitated by public health and safety, the tariff violates the common law relocation rule that has been incorporated into the Public Utility Act. As a result, Rate 22 exceeds the PRC's statutory authority. As contemplated by the common law rule, safety-related relocation costs are to be treated like other safety costs as a cost of service. We therefore vacate the tariff and remand this matter to the PRC for further proceedings.

{30} **IT IS SO ORDERED.**

WE CONCUR: PETRA JIMENEZ MAES, Chief Justice, PAMELA B. MINZNER, RICHARD C. BOSSON, and EDWARD L. CHÁVEZ, Justices.