619 P.2d 542

**Derk A. JONES, Petitioner–Appellant,**

v.

**EMPLOYMENT SERVICES DIVISION OF the HUMAN SERVICES DEPARTMENT, Respondent–Appellee.**

**No. 12789.**

Supreme Court of New Mexico.

Nov. 18, 1980.

Menig, Sager, Curran & Sturges, Bradley D. Tepper, Albuquerque, for petitioner–appellant.

C. Reischman, Human Services Dept., Albuquerque, for respondent–appellee.

## OPINION

PAYNE, Justice.

Derk Jones was terminated from his job as a truck driver for alleged misconduct related to his work. He applied for unemployment compensation benefits. The Employment Services Division (ESD) denied Mr. Jones benefits based on a finding that he was discharged "for being absent from work and failing to properly notify" his employer. The appeal tribunal of ESD reversed the determination and granted benefits to Mr. Jones, finding the reasons for

discharge did not constitute misconduct related to employment. Mr. Jones' employer, Big Three Industries, appealed to the Secretary of the Department of Human Services who remanded the case to the appeal tribunal to consider the question of whether the employer had standing to appeal inasmuch as it had failed to return form ES–442 as required by the ESD.[1] On remand, the appeal tribunal found that the failure to return the form ES–442 was for good cause and did not affect the standing of the employer. The issue of whether Mr. Jones was guilty of misconduct was left to be decided by a new Secretary of the Human Services Department who reversed the appeal tribunal and denied benefits to Jones. Jones petitioned the district court for certiorari which affirmed the disqualification of Jones from unemployment benefits. Mr. Jones again appeals. We also affirm.

This matter raises three issues. Did the employer, Big Three Industries, have standing to appeal the appeal tribunal decision? Is there substantial evidence to support the commission's findings? Did petitioner's actions constitute misconduct so as to disqualify him from unemployment compensation benefits?

### I.

■ We first determine whether the employer had standing to appeal the decision of the ESD appeal tribunal. Jones argues that the failure of the employer to file the ES–442 within five days bars it from appealing an administrative decision dealing with this case. An examination of the controlling statute, Section 51–1–8, N.M.S.A. 1978 (Repl.Pamp.1979), shows this belief of petitioner to be in error. If there is a conflict or inconsistency between statutes and regulations promulgated by an agency, the language of the statutes shall prevail. An agency by regulation cannot overrule a specific statute. The statute,

Section 51–1–8 (B through G), grants all interested parties, including the employer, the right to appeal a decision of the Department if they file within fifteen days of the date of that decision. Big Three Industries filed its notice of appeal within the fifteen days mandated by the statute. Section 51–1–8(G) allows a department to determine the manner and mode of such appeals by its regulations, but it does not permit the regulations to foreclose a right of an interested party to appeal a decision of the ESD.

### II.

■ Second, we must determine whether the findings made by the appeal tribunal are supported by substantial evidence and therefore binding on the district court. *Wilson v. Employment Security Commission*, 74 N.M. 3, 389 P.2d 855 (1963). The appeal tribunal found that the petitioner failed, as required by company policy, to give notice every twenty–four hours of his intended absence and failed to notify the employer four hours in advance of his assigned shift. The findings of the tribunal are not unsubstantiated simply because the evidence may be conflicting. *Wickersham v. New Mexico State Board of Education*, 81 N.M. 188, 464 P.2d 918 (Ct.App.1970); *Fox v. Doak*, 78 N.M. 743, 438 P.2d 153 (1968). Although the evidence is conflicting, we find substantial evidence which supports the findings of the appeal tribunal. As stated in *Wilson v. Employment Security Commission, supra*, those findings were binding on the district court. The tribunal found that after arriving at the plant at or about 7:00 p. m. on May 15, the petitioner clocked out at approximately 11:00 p. m., putting himself voluntarily in violation of ICC regulations. He told his supervisor that he was ill but agreed to take the 8:00 a. m. run on May 16. Petitioner admittedly made no contact with the plant prior to a phone call he testified he made at 6:00 or

---

1. D. FAILURE TO REPLY.–Failure on the part of the employer to notify the Commission within five working days in at least one of the three methods provided in Subsections A, B or C of this Regulation shall, at the expiration of the period set for response, be deemed an irrev-

ocable waiver of his rights to be heard before a determination is made, and benefits charged to his account as a result of the determination shall remain so charged. Regulation 308(D) of the ESD Regulations.

7:00 p. m. on May 16, almost twelve hours after his assigned shift began. No record was made of this May 16 call, although as Jones admits, the policy of the company was to log all incoming calls. Even if this call was made, it was not sufficient to qualify as notice to the employer as required by company policy. The notice must be given to supervisory personnel, who are available twenty–four hours. The phone call was to a friend at the plant and not to supervisory personnel.

### III.

The last issue to be decided is whether the findings of the district court are sufficient to support its conclusion that the termination resulted from "misconduct connected with work" under the provisions of Section 51–1–7(B), N.M.S.A. 1978 (Repl. Pamp.1979). No definition of misconduct is found in the unemployment compensation statute, Sections 51–1–1 to 51–1–54, N.M. S.A. 1978. Because of this lack of definition, this Court in *Mitchell v. Lovington Good Samaritan Center, Inc.*, 89 N.M. 575, 555 P.2d 696 (1976), adopted a definition of misconduct as set forth in *Boynton Cab Co. v. Neubeck*, 237 Wis. 249, 259–60, 296 N.W. 636, 640 (1941), quoted below:

> [M]isconduct ... is limited to conduct evincing such wilful or wanton disregard of an employer's interest as is found in deliberate violations or disregard of standards of behavior which the employer has a right to expect of his employee, or carelessness or negligence of such degree or reoccurrence as to manifest equal culpability, wrongful intent or evil design or to show unintentional and substantial disregard of the employer's interest or the employee's duties and obligations to his employer.

While this Court has reservations concerning whether mere absence or tardiness alone, without unheeded warnings or past history of absence, constitutes misconduct as defined above, *see White v. Industrial Commission*, 518 P.2d 292 (Colo.App.1973); *Januzik v. Dept. of Employment Sec., etc.*, 569 P.2d 1112 (Utah 1977), there is suffi-

cient evidence to support the lower court's finding of misconduct. We approved using the totality of the circumstances in determining if there is misconduct under our unemployment statutes. *Mitchell v. Lovington Good Samaritan Center, Inc., supra.* The evidence here established three separate incidents: (1) that Mr. Jones failed to give notice every twenty–four hours of his intended absence as required by company regulations; (2) that Mr. Jones failed to give notice four hours prior to his assigned shift, and (3) that Mr. Jones intentionally put himself in violation of ICC regulations which forced his employer to find a replacement for his 1:30 a. m. run. Individually these incidents may not have been enough to constitute misconduct, but taken together they do.

We therefore affirm the district court.

IT IS SO ORDERED.

SOSA, C. J., and EASLEY and FEDERICI, JJ., concur.

FELTER, J., dissents.

FELTER, Justice, dissenting.

I dissent.

I have difficulty with two aspects of the majority opinion. First, I am troubled by the finding that there was substantial evidence to support the Department's decision. It does not appear to me that this Court in reviewing the decision below has availed itself of the more enlightened version of the substantial evidence test. It would seem that this Court has only looked to see if there is any evidence, more than a scintilla, to support the Department's findings. This Court has said in effect that its job is done when it finds there is more than a scintilla of evidence to support the administrative decision and that it need look no further once that point is reached. New Mexico courts have not addressed the "new" substantial evidence test, which was promulgated by the Congress of the United States when the Administrative Procedure Act was passed. "Administrative Procedure Act", Pub.L.No. 79–404, 60 Stat. 237 (current version at 5 U.S.C. Sections 551 et seq.

(1976)). New Mexico has adopted an administrative procedure act, Sections 12–8–1 to 12–8–25, N.M.S.A. 1978, which was modeled after the federal act (5 U.S.C. Sections 551, et seq. 1976)). I am well aware that whether or not New Mexico follows the federal act does not govern our standard of review but I am convinced that the act carries with it a more providential approach to judicial review of administrative action which should be adopted by this Court.

In the leading case of *Universal Camera Corp. v. Labor Bd.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), the United States Supreme Court was asked to decide if the "substantial evidence test" was the same under both the Taft–Hartley Act, 29 U.S.C. Section 141 et seq. (1976), and the Administrative Procedure Act, *supra*. In so deciding, Justice Frankfurter, writing for the majority discussed the changes intended by the Administrative Procedure Act. In the report of the Attorney General's Committee on the Walter–Logan Bill, S. 915, H.R. 6324 76th Cong., 1st Sess. (1939), which bill aimed to tighten control over administrative determinations of fact, the majority of the Committee concluded that:

> "[d]issatisfaction with the existing standards as to the scope of judicial review derives largely from dissatisfaction with the fact–finding procedures now employed by the administrative bodies." Departure from the "substantial evidence" test, it was thought, would either create unnecessary uncertainty or transfer to courts the responsibility for ascertaining and assaying matters the significance of which lies outside judicial competence. Accordingly, it recommended against legislation embodying a general scheme of judicial review. (Footnotes omitted.)

*Universal Camera, supra*, at 480, 71 S.Ct., at 460.

Three members of the Committee dissented stating that the:

> "present system or lack of system of judicial review" led to inconsistency and uncertainty. They reported that under a "prevalent" interpretation of the "sub-

stantial evidence" rule "if what is called 'substantial evidence' is found anywhere in the record to support conclusions of fact, the courts are said to be obliged to sustain the decision without reference to how heavily the countervailing evidence may preponderate–unless indeed the stage of arbitrary decision is reached. Under this interpretation, the courts need to read only one side of the case and, if they find any evidence there, the administrative action is to be sustained and the record to the contrary is to be ignored." Their view led them to recommend that Congress enact principles of review applicable to all agencies not excepted by these unique characteristics. One of these principles was expressed by the formula that judicial review could extend to "findings, inferences, or conclusions of fact unsupported, upon the *whole record*, by substantial evidence." (Footnotes omitted.) (Emphasis added.)

*Id.* at 481, 71 S.Ct. at 460.

On the one hand, the sponsors of the legislation indicated that they were reaffirming the prevailing "substantial evidence" test. But with equal clarity they expressed disapproval of the manner in which the courts were applying their own standard. The committee reports of both houses refer to the practice of agencies to rely upon "suspicion, surmise, implications, or plainly incredible evidence," and indicate that courts are to exact higher standards "in the exercise of their independent judgment", and on consideration of "the whole record." (Footnotes omitted.)

*Id.* at 483–84, 71 S.Ct. at 462.

It is my belief that this Court must hold itself to the "higher standards" and consider the entire record in making its determination to uphold or reverse the decision of the administrative agency.

Justice Frankfurter continued:

The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is clearly the significance of the requirement in both statutes [Taft–Hartley Act and Ad-

ministrative Procedure Act, *supra*] that courts consider the whole record.

To be sure, the requirement for canvassing "the whole record" in order to ascertain substantiality does not furnish a calculus of value by which a reviewing court can assess the evidence. Nor was it intended to negative the function of the Labor Board as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect. Nor does it mean that even as to matters not requiring expertise a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*. Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view.

*Id.* at 488, 71 S.Ct. at 464.

There is a great body of evidence opposed to the decision below. Let us consider the testimony that was presented to the Appeal Tribunal.

Petitioner was a truck driver who was employed by Big Three Industries, Inc., from September 1976 until May 1978, as a transport driver. On May 15, 1978, petitioner began working at 1:30 a. m. Accepting the testimony of Mr. Miller, the Albuquerque plant branch manager of Big Three Industries, Inc., petitioner arrived back in Albuquerque between 6:30 and 7:30 a. m. on May 15, 1978, after a trip to and from Farmington, New Mexico. Petitioner claims he did not clock out until 11:00 p. m., May 15, 1978. Also, according to Mr. Miller's testimony (based upon what was told to him by the dispatcher, Mike Chandler, who was not present for cross-examina-

tion), petitioner allegedly told Chandler he would make a 1:30 a. m. run on May 16, 1978, but called back two or three hours later and told Chandler he was sick. However, again according to Mr. Miller's testimony of his conversation with Mr. Chandler, petitioner allegedly agreed to come in at 8:00 a. m. on May 16, 1978. Mr. Miller said that they did not hear from petitioner until a couple of days later, which prompted Big Three to fire him. Mr. Miller testified company rules require drivers who are ill to contact the company every 24 hours to advise the company. Policy requires four hour notice if an employee is not going to be able to make a run. Plant operators are on duty 24 hours a day.

Mr. Miller stated on page 20 of the transcript the reasons for which petitioner was fired:

Mr. Chandler told me that Derk Jones had agreed to come out a certain time in the morning to go to work the next morning and yet we had not heard from him in two days, so we went to Mr. Crawford and told him what was happening. We were in a situation where we needed the truck drivers and this and that. So he said, 'It looks like it's job abandonment to me, and he's just not going to show up. So the next time you see him, just give him his papers.'

The following recitation of facts, paraphrased from petitioner's brief before the district court summarizes petitioner's version of the events. Much of his testimony is undisputed. During petitioner's long working day on May 15, 1978, he felt ill and nauseated having had diarrhea all day at the job site. He was physically and emotionally exhausted and told the Big Three dispatcher he was sick and wanted to be taken off the dispatching board. According to petitioner, Mike Chandler never told him he was to make an 8:00 a. m. run on May 16, although Mr. Chandler was irritated that petitioner was not going to make a run at 1:30 a. m., just two hours after petitioner clocked in after a 21 hour day. Instead, petitioner, in accordance with Federal Motor Carrier Safety Regulations promulgated

by the Department of Transportation, 49 C.F.R. § 395.3 (1979), deemed himself too ill and fatigued to drive and asked to be taken off the board.

Petitioner's conduct after notifying Big Three of his illness verified his debilitated condition. Because petitioner had been unable to hold anything down during the day and night of the 15th, he went to a restaurant to get something to eat (cottage cheese and milk), attempting to recoup some of his strength. After eating, he still felt sick. Since he lived by himself and thought he might be seriously ill, he went to the house of some friends, waking them up during the early hours of May 16. He went to bed at their house, but was unable to fall asleep until 4:00 a. m. During the afternoon of May 16, 1978, petitioner awoke and went to see his physician, Dr. Don Hedges, who diagnosed his condition as physical and mental fatigue. Dr. Hedges' report verifying his diagnosis is in the record.

After coming back from the doctor's office, at approximately 6:30 p. m. on May 16, 1978, petitioner called the Big Three plant and talked to two employees of Big Three, including Mr. Gene Buck, an operator at the plant, the person Mr. Miller testified he was supposed to call, and told him that he was "still off" although he was feeling better. Petitioner understood that if he was ill for a 24–hour period, company rules required him to call a plant operator, such as Gene Buck, and inform him he was still sick. He did not think his continued illness required calling a plant supervisor at home. Big Three knew petitioner had talked to ·employees at the plant prior to May 17, 1978.

After speaking with Gene Buck and his friend, Don Moore, petitioner went back to bed and did not get up for more than twenty hours. When he awoke he felt able to go back to work so he called the plant and asked the dispatcher, Mike Chandler, to put him back on the board. Mr. Chandler then informed petitioner that he had been fired.

Petitioner clocked out at 11:00 p. m. on May 15, 1978. He called back several hours later and told Chandler he was sick. He talked to Gene Buck at approximately 6:30

p. m. on May 16 and told Gene Buck, the operator on duty, that he was still sick. He reported for work at 3:30 p. m. on May 17, 1978. Petitioner never was out of contact with Big Three for a 24–hour period.

Petitioner did not give notice four hours in advance of 8:00 a. m. on May 16, 1978, that he would not be able to make a run. However, substantial evidence is not in the record establishing that petitioner was, in fact, assigned to come in at 8:00 a. m. The only testimony in the record that supports this finding is on page 21 of the transcript in which Mr. Miller relates what was told to him by Mike Chandler about a conversation Mr. Chandler had with petitioner in which petitioner purportedly agreed to come in at 8:00 a. m. Although hearsay is admissible in the administrative proceedings below, this testimony damning the petitioner was entitled to little if any weight and does not constitute substantial evidence. Petitioner claimed he never agreed to come in at 8:00 a. m. He was too sick. Petitioner was never given an opportunity to cross–examine his accuser, the important protection which the hearsay rule affords. Dispensing with the hearsay rule during administrative proceedings is to expedite the determination of claims, not to deny the claimant a fair hearing. It is significant that the Appeal Tribunal, which initially considered the hearsay accusations of Mr. Miller, related in person, gave them the weight they deserved and held in petitioner's favor.

When I consider the record as a whole in the instant case, I cannot conscientiously find that the evidence supporting the decision of the trial court is substantial.

To quote Justice Frankfurter:

A formula for judicial review of administrative action may afford grounds for certitude but cannot assure certainty of application. Some scope for judicial discretion in applying the formula can be avoided only by falsifying the actual process of judging or by using the formula as an instrument of futile casuistry. It cannot be too often repeated that judges are not automata. The ultimate reliance for the fair operation of any standard is a

judiciary of high competence and character and the constant play of an informed professional critique upon its work.

* * * There are no talismanic words that can avoid the process of judgment.

\*     \*     \*     \*     \*     \*

* * * But a standard leaving an unavoidable margin for individual judgment does not leave the judicial judgment at large even though the phrasing of the standard does not wholly fence it in. The legislative history of these acts demonstrates a purpose to impose on courts a responsibility which has not always been recognized.

*Id.* at 488–489, 71 S.Ct. at 465.

This Court should recognize that we can no longer merely find in the record evidence which supports an agency's decision so long as that evidence is more than a scintilla. It is clear from the pronouncement of Justice Frankfurter in the *Universal Camera* case, *supra*, that a change was intended because of growing dissatisfaction with the exercise of review on the part of reviewing courts. Applying this standard, I cannot join the majority in finding substantial evidence to support the decision below.

Second, I agree with the majority that the definition of misconduct is the one adopted by this Court in *Mitchell v. Lovington Good Samaritan Center*, 89 N.M. 575, 555 P.2d 696 (1976), and cited in the majority opinion. However, the acts of Mr. Jones do not rise to the level of misconduct contemplated by the statute necessary to deprive him of unemployment compensation benefits.

I have found no case that has denied a person unemployment compensation benefits because of one absence without at least a prior warning. Cases which have denied such benefits usually evidence chronic absenteeism or a history of unheeded warnings as the majority recognizes. Such histories are useful to us to determine if an employee's conduct rose to the level of misconduct contemplated by our statute. Sections 51–1–1, et seq., N.M.S.A. 1978 (1979 Repl.Pamp.).

In *Thompson v. Hygrade Food Products Corp.*, 137 Ind.App. 591, 210 N.E.2d 388 (1965), the question was whether appellant was discharged for misconduct in connection with his work. Appellant claimed he was discharged when he called his employer to tell her that he was ill and there was also evidence that no such call was made. It was also found that appellant had been in 1963, tardy eight times, absent seven days without report, absent nine days for personal business and had 121 days of excused compensated illness and three weeks vacation.

The court said "It has been held that *chronic* absence without notice and without permission amounts to misconduct...." (Emphasis added.) *Id.*, 310 N.E.2d at 390.

Where failure to notify the employer of an intended absence was a breach of company rules, a claimant discharged for taking a day off without notice in order to seek other employment was held guilty of misconduct. In *Ware v. Brown*, 147 So.2d 455 (La.Ct. of App. 1962), the court concluded that the employee had made no reasonable effort to notify his employer of his intended absence, a deliberate violation of the company's rules, as well as a disregard of the employer's interest, since the company had no way of knowing of the claimant's whereabouts or how he could be reached. This, the court declared, constituted misconduct under the pertinent portions of the unemployment compensation law. In *Ware*, the employee testified that he attempted to call the office at a time when he knew that the office was not open. This evidence was not refuted. Mr. Jones' actions did not reach this extreme. He made efforts to contact the employer and except for the first evening could have been contacted.

In *Curran v. Unemployment Compensation Board of Review*, 181 Pa.Super. 578, 124 A.2d 404 (1956), the record disclosed that claimant was absent from work without notice twice in one month and five times the next, after which he received a written notice warning that future absence without notice would result in dismissal. After another absence without notice he was discharged. The court found that the

claimant had no regard for the standards of behavior expected of him and found him guilty of wilful misconduct disqualifying him from receiving unemployment compensation benefits. In this case, the employee had not only a history of absenteeism but had been warned as well. No such chronic absenteeism or history of warnings exist in the instant case and as such Jones showed no disregard for the standards expected of him.

The cases in accord with the requirement of a prior history of absenteeism or unheeded warnings are too numerous to cite but may be found in an excellent annotation at 58 A.L.R.3d 674 (1974). It is clear that this court should not deny benefits to someone who has no record of absenteeism or of disregarding warnings. As we said in *Employment Sec. Com'n v. C. R. Davis Contracting Co.*, 81 N.M. 23, 462 P.2d 608 (1969), the unemployment compensation act "is remedial legislation that calls for a liberal construction to the end that humanitarian purposes may be given effect." (Citation omitted.) *Id.* at 25, 462 P.2d at 610.

It is clear from the cases cited above that some history of absenteeism or prior alleged misconduct is required to disqualify one from unemployment compensation benefits. A single absence may suffice to deny benefits, provided that there has been a prior incident such as one which resulted in a warning relating to an instance of misconduct. *Broadway & Fourth Avenue Realty Co. v. Crabtree*, 365 S.W.2d 313 (Ky.1963). What happened to Mr. Jones at the very most could only be considered one incident of alleged misconduct. Without even a prior warning he should not be denied benefits on the grounds of misconduct connected with work. There has been no evidence to support a charge that his conduct was in wilful or wanton disregard of his employment.

At most his actions could be characterized as inept or:

> mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies or ordinary negligence in isolated instances, or good faith errors in judgment or discretion [which] are not to be deemed "misconduct" within the meaning of the statute.

Similar conclusions were reached in decisions by the British Umpire, established by Parliament for the ultimate review of decisions by the Court of Referees in matters relating to unemployment compensation. *Boynton Cab Co. v. Neubeck*, 237 Wis. 249, 296 N.W. 636, 640 (1941).

To deny employment compensation for this single incident of alleged misconduct would be to do violence to the remedial nature of the statute.

> If mere mistakes, errors in judgment or in the exercise of discretion, minor and but casual or unintentional carelessness or negligence, and similar minor peccadilloes must be considered to be within the term "misconduct", and no such element as wantonness, culpability or wilfulness with wrongful intent or evil design is to be included as an essential element in order to constitute misconduct within the intended meaning of the term as used in the statute, then there will be defeated, as to many of the great mass of less capable industrial workers, who are in the lower income brackets and for whose benefit the act was largely designed, the principal purpose and object under the act of alleviating the evils of unemployment by cushioning the shock of a layoff, which is apt to be most serious to such workers. In view of these consequences which would thus result if the provision as to misconduct, under which an employee may become subjected to the forfeiture, must be deemed applicable to all types of "misconduct" that can be considered to be within the broad scope of that term (as defined in the above quotation from 40 C.J. p. 1220), and in view of the ambiguous or doubtful import in its meaning as used in the statute, it is necessary and proper to resort to the rule that statutes providing for forfeitures are to be strictly construed and terms and provisions therein, which are ambiguous or of doubtful meaning, will be given the

construction which is least favorable to working a forfeiture, so as to minimize the penal character of the provision by excluding rather than including conduct or cases not clearly intended to be within the provision. "Where the purpose is uncertain, the language should be read strictly to soften its severity; where otherwise, it would express a meaning which would be unreasonably harsh."

*Id.*

In view of Mr. Jones' past history, that he had never previously been absent without notice, nor warned about such conduct, it would be a manifest injustice to deny him the benefits provided by our unemployment compensation law.

It might also be noted that this Court recently reiterated the "residuum rule" in the case of *Trujillo v. Employment Security Commission,* 19 N.M.St.B.Bull. 453 (1980). The Court held that a reviewing court is required by the rule to set aside an administrative finding unless supported by evidence which would be admissible in a jury trial. The only testimony in the record as to whether Jones agreed to report at 8:00 a. m. on May 16, 1978 is the hearsay testimony of Mr. Miller. Such evidence would not be admissible in a jury trial. Nor would such controverted hearsay qualify as substantial evidence.

The majority also finds that Jones intentionally placed himself in violation of I.C.C. regulations, 49 C.F.R. § 395.3(a) (1979), forcing his employer to find replacement for him. This finding is supported only by hearsay testimony of Mr. Miller as to what Mr. Chandler told him. This evidence is controverted by Mr. Jones. Under *Trujillo, supra,* this controverted hearsay cannot be considered substantial evidence nor can the decision rest on evidence that would not be admissible at a jury trial.

I would therefore reverse the trial court and allow Mr. Jones to receive unemployment compensation benefits. The majority feeling otherwise, I respectfully dissent.