# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:** _____

**Filing Date:  April 6, 2015**

**NO. 34,182**

**TRI-STATE GENERATION AND TRANSMISSION ASSOCIATION, INC.,**

     Appellant,

v.

**NEW MEXICO PUBLIC REGULATION COMMISSION and KIT CARSON ELECTRIC COOPERATIVE, INC.,**

     Appellees.

**APPEAL FROM THE NEW MEXICO PUBLIC REGULATION COMMISSION**

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
John R. Cooney
Joan E. Drake
Emil John Kiehne
Albuquerque, NM

Lewis Roca Rothgerber LLP
Thomas J. Dougherty
Denver, CO

Sherman & Howard, LLC
Robert E. Youle
Brian G. Eberle
Denver, CO

for Appellant


New Mexico Public Regulation Commission
Richard L. Blumenfeld
Santa Fe, NM

for Appellee New Mexico Public Regulation Commission


Cuddy & McCarthy, LLP
Charles V. Garcia
Albuquerque, NM

Cuddy & McCarthy, LLP
Arturo L. Jaramillo
Patrick T. Ortiz
Santa Fe, NM

for Appellee Kit Carson Electric Cooperative, Inc.

**OPINION**

**DANIELS, Justice.**

{1}     In this precedential case of first impression, we address a number of issues related to the New Mexico Public Regulation Commission's authority and procedures in regulating utility rates of a generation and transmission cooperative, which statutorily differ from the Commission's powers over the rates charged by public utilities. We vacate the order of the Commission related to its suspension of a cooperative's proposed rates and provide guidance for similar situations that may arise in the future.

**I.     BACKGROUND**

{2}     As a generation and transmission cooperative (G&T Coop) owned by forty-four distribution cooperatives that are each members of its board, Tri-State Generation and Transmission Association, Inc., sells electric power exclusively to its members in four states. To cover its costs, Tri-State charges rates in accordance with a revenue requirement and a rate design approved by the Tri-State board. In 2012, the Tri-State board approved a new revenue requirement and a new rate design to meet that revenue requirement for 2013 (the 2013 rate design) and to replace the rate design and revenue requirement in effect at that time (the old rate design).

{3}     As required by NMSA 1978, Section 62-6-4(D) (2003), Tri-State filed Advice

Notice 15 (AN 15) informing the Commission of the 2013 rate design. For the first time since the 2000 enactment of Subsection (D) of Section 62-6-4, three of the twelve Tri-State New Mexico members (the Kit Carson, Continental Divide, and Springer Electric Cooperatives) protested the 2013 rate design, and the Commission opened Case No. 12-00375-UT (the 2013 rate case). The Commission found that the three protesting members had just cause under Section 62-6-4(D) for the Commission to suspend the 2013 rate design, and it set a hearing to consider whether the 2013 rate design was reasonable. One of the commissioners suggested that Tri-State could file a proposal for interim rates if it wished.

{4}     With the 2013 rate design suspended, the Tri-State board agreed to address its revenue requirement on an interim basis by billing the protesting members under the old rate design and the nonprotesting members under the 2013 rate design. Pursuant to Section 62-6-4(D), Tri-State filed Advice Notices 16, 17, and 18 (ANs 16, 17, and 18) with the Commission. According to the letter Tri-State attached to its advice notices, AN 16 applied the 2013 rate design contained in AN 15 to the nine nonprotesting members so that the nonprotesting members could take advantage of the 2013 rate design as soon as possible. Apparently, many of the nonprotesting members had already taken steps to implement the 2013 rate design. AN 17 sought

to recover the portion of the 2013 revenue requirement attributable to the three protesting New Mexico members using the old rate design. AN 18 was an alternative to AN 17 that would allow two additional months, compared to AN 17, to recover the revenue required under AN 17 from the protesting members in case any of the three elected to waive the contractual ninety-day notice requirement Tri-State incurred by replacing the 2013 rate design with the old rate design.

{5}    When the same members that protested AN 15 filed protests against ANs 16, 17, and 18, the Commission opened Case No. 13-00037-UT (the interim rate case) and issued an order on March 13, 2013, rejecting ANs 16, 17, and 18 (the Order). The Order rejected a public hearing of AN 16, concluding that "the rates in question are already before a Hearing Examiner" because AN 16 applied rates "identical" to the rates pending in the 2013 rate case. The Order rejected ANs 17 and 18, stating that they "would result in what would be perceived as punishing the protestors." On "separate and independent grounds," the Order rejected ANs 16, 17, and 18 for the failure of Tri-State to satisfy the interim rate pleading burden imposed by a Commission regulation, 1.2.2.27 NMAC (Rule 27).

{6}    Several months after the Commission issued the Order, Tri-State filed a notice of withdrawal from the 2013 rate case in order to file Advice Notice 19 (AN 19)

informing the Commission of a rate increase to take effect as of January 1, 2014. The Commission stayed discovery and vacated the procedural schedule on the 2013 rate case, pending responses by the parties to Tri-State's notice of withdrawal. Tri-State appealed to this Court from the Order, arguing that the Commission exceeded its statutory authority and that the Order was arbitrary or contrary to law. This Court reviews appeals from the final orders of the Commission. *See* NMSA 1978, § 62-11-1 (1993). Appellee Kit Carson Electric Cooperative filed a motion to dismiss this appeal on two grounds: that the Order was not final and that the appeal was moot, issues we address in this opinion.

## II.     DISCUSSION

{7}     Tri-State has the burden on appeal of showing that the Order is "unreasonable" or "unlawful." NMSA 1978, § 62-11-4 (1965). This Court considers only the evidence on the record before the Commission, *see* NMSA 1978, § 62-11-3 (1982), and reviews in favor of the Order to determine whether it was supported by substantial evidence, was neither arbitrary nor capricious, and was within the Commission's scope of authority. *See Plains Electric Generation & Transmission Coop. v. N.M. Pub. Util. Comm'n*, 1998-NMSC-038, ¶ 7, 126 N.M. 152, 967 P.2d 827. This Court can either affirm or annul and vacate the Order but cannot modify it.

4

*See* NMSA 1978, § 62-11-5 (1982).

{8}     Section 62-6-4(D) of the Public Utility Act (PUA)[1] is the only statutory provision that grants the Commission jurisdiction over G&T Coops like Tri-State. Section 62-6-4(D) requires that a G&T Coop file its proposed New Mexico rates with the Commission in the form of an advice notice and serve its member utilities. *See id.* If at least three New Mexico member utilities file protests with "just cause," the Commission "shall suspend the rates, conduct a hearing concerning reasonableness of the proposed rates and establish reasonable rates." *Id.* Section 62-6-4(D) further defines the requirements of a protest. *Id.*

{9}     Once the Commission's jurisdiction and rate-making powers are invoked under Section 62-6-4(D), as in this case, the Commission has plenary authority to set the utility's rates. *City of Albuquerque v. N.M. Pub. Regulation Comm'n*, 2003-NMSC-028, ¶ 8, 134 N.M. 472, 79 P.3d 297. And this Court defers to the "relatively broad policy-making authority" that the Legislature delegates to the Commission unless the

---

[1]The entire PUA is set forth in NMSA 1978, §§ 62-1-1 to -7 (1909, as amended through 1993), 62-2-1 to -22 (1884, as amended through 2013), 62-3-1 to -5 (1967, as amended through 2009), 62-4-1 (1998), 62-6-4 to -28 (1941, as amended through 2009), 62-8-1 to -11 (1941, as amended through 2011), 62-9-1 to -7 (1941, as amended through 2005), 62-10-1 to -16 (1941, as amended through 1998), 62-11-1 to -6 (1941, as amended through 1993), 62-12-1 to -7 (1941, as amended through 1993), and 62-13-1 to -15 (1941, as amended through 2010); *see* § 62-13-1 (specifying the range of articles in Chapter 62 that comprised the PUA in 1993).

5

Commission's interpretation of its statutory authority is "unreasonable." *Doña Ana Mut. Domestic Water Consumers Ass'n v. N.M. Pub. Regulation Comm'n*, 2006-NMSC-032, ¶ 17, 140 N.M. 6, 139 P.3d 166.

{10}     "When reviewing statutes this [C]ourt will read all relevant provisions together in order to determine legislative intent." *Otero Cnty. Electric Coop. v. N.M. Pub. Serv. Comm'n*, 1989-NMSC-033, ¶ 9, 108 N.M. 462, 774 P.2d 1050. "In reviewing utility regulations as applied to rate cases, this [C]ourt has interpreted the statutory language broadly" consistent with the considerable discretion with which the Commission is vested to determine whether rates are just and reasonable. *Id.*

**A.     Advice Notices 17 and 18 Did Not Unlawfully Discriminate Among Tri-State Member Cooperatives**

{11}     The Order rejected ANs 17 and 18 because approving them "would result in what would be perceived as punishing the protestors." The Commission concluded that ANs 17 and 18 were discriminatory as a matter of law because, as it argues on appeal, "[t]he Legislature has prohibited discriminatory treatment of ratepayers [in] Section 62-8-6." The Commission asks us to affirm its Order denying Tri-State's interim rates because Tri-State cited no decision from this Court or the Commission supporting Tri-State's method of treating protestors and nonprotestors differently.

{12}     The language of Section 62-8-6, however, expressly applies only to public

6

utilities and makes no reference at all to G&T Coops.

> No public utility shall, as to rates or services, make or grant any unreasonable preference or advantage to any corporation or person within any classification or subject any corporation or person within any classification to any unreasonable prejudice or disadvantage.

*Id.* The PUA is explicit in tailoring the Commission's authority over the rates of different kinds of utilities depending on whether a utility is, for example, a "public utility," *see* § 62-6-4(A) (defining the power and jurisdiction of the Commission over the rates of public utilities), a "rural electric cooperative," *see* § 62-8-7(G) (same for rural electric cooperatives), or a "generation and transmission cooperative," *see* § 62-6-4(D) (same for G&T Coops). We find no support for the proposition that Section 62-8-6 is the source of Commission authority to disapprove the rates of a G&T Coop. Instead, Section 62-6-4(D) gives the Commission the authority to determine the reasonableness of the rates of a G&T Coop after at least three of its members file protests that the Commission determines have just cause.

{13}    There are strong indications throughout the PUA that the Legislature intended the Commission's powers over a G&T Coop to be more limited than its powers over a public utility. A public utility sells power to the general public, but a G&T Coop sells power exclusively to other cooperatives that are its members. *Compare* § 62-6-4(E) ("'[G]eneration and transmission cooperative' means a person with generation

7

or transmission facilities either organized as a rural electric cooperative . . . or organized in another state and providing sales of electric power to *member cooperatives* in this state." (emphasis added)), *with* § 62-3-3(G)(1) ("'[P]ublic utility' or 'utility' means every person not engaged solely in interstate business . . . that may own, operate, lease or control . . . any . . . facility for the generation, transmission or distribution, sale or furnishing *to or for the public* of electricity . . . ." (emphasis added)). The ownership and organization of a rural electric cooperative or a G&T Coop differs from that of a public utility. *Compare* NMSA 1978, § 62-15-2 (1998) (stating that rural electric cooperatives are organized on a nonprofit or cooperative basis under NMSA 1978, Sections 62-15-1 to -37 (1939, as amended through 2014), "for the primary purpose of supplying electric power [to] . . . and extending the use of electricity in rural areas"), *and* § 62-6-4(E) (stating that a G&T Coop may be organized as a rural electric cooperative), *with* § 62-3-2(A)(3) (describing public utilities as "investor-owned" and "profit motivated"). *See also* Richard P. Keck, *Reevaluating the Rural Electrification Administration: A New Deal for the Taxpayer*, 16 Envtl. L. 39, 45-47 (1985) (describing the history of the federal Rural Electrification Act and electric cooperatives and explaining how rural electric cooperatives and generation and transmission cooperatives were born in the late

1930s as a result of that congressional enactment to incentivize the electrification of rural America by authorizing low-interest loans for generation and transmission facilities as well as for distribution facilities).

{14} The PUA limits the Commission's power and jurisdiction over cooperatives as compared to public utilities. The Commission has "general and exclusive power and jurisdiction to regulate and supervise every public utility in respect to its rates and service regulations . . . ." Section 62-6-4(A). A public utility cannot change its rates without first obtaining the Commission's approval. *See* § 62-8-7(A)-(F). When a public utility requests a rate change, the Commission "may" conduct a hearing concerning the reasonableness of the rates; and the proposed rates are suspended until the Commission determines reasonable rates. *See* § 62-8-7(C). At any hearing involving an increase in rates, the public utility carries the burden of proving that the increase "is just and reasonable." Section 62-8-7(A).

{15} In contrast, the Commission's jurisdiction over a rural electric cooperative or a G&T Coop is not general and exclusive but instead must be triggered by protests filed by a prescribed number of members before the Commission has any power over proposed rates. *See* § 62-6-4(A) (excluding the rates of G&T Coops from the general and exclusive power of the Commission to regulate the rates of public utilities); § 62-

6-4(D) (setting forth the requirements of the protests that could cause the Commission to review the rates submitted by a G&T Coop). The rates of a rural electric cooperative become effective "as proposed" except "[u]pon the filing with the [C]ommission of a protest setting forth grounds for review of the proposed rates" by the prescribed portion of customers with just cause. Section 62-8-7(G). Although Section 62-6-4(D) does not expressly state that the rates of a G&T Coop are effective as proposed, it specifically allows the Commission to suspend the rates submitted by a G&T Coop only when the specified number of protests with just cause have been filed. *See id.* ("If three or more New Mexico member utilities file protests [with just cause], the [C]ommission shall suspend the rates . . . .").

{16}     The Legislature directed that rural electric cooperatives are to be regulated in a "limited" manner because they are "substantially different" from public utilities. Section 62-3-2(A)(3). Consumers have no control over the rates of investor-owned public utilities, *id.*, and accordingly the PUA seeks a balanced regulation that addresses "the public interest, the interest of consumers and the interest of investors." Section 62-3-1(B). In contrast, the interests of the purchasers of electric power from a G&T Coop, who own the G&T Coop, are already addressed democratically through the owner-membership of the G&T Coop board. *See* § 62-3-2(A)(2)-(3) (stating that

10

members of cooperatives have "direct control over the cooperative's rates through an elected board of trustees"); *see also Morningstar Water Users Ass'n v. N.M. Pub. Util. Comm'n*, 1995-NMSC-062, ¶ 20, 120 N.M. 579, 904 P.2d 28 ("The PUA attempts to distinguish on the one hand utilities that are required to serve any and all members of the public who request [utility] service and on the other hand utilities that operate more like a private coalition or club that chooses to limit its services only to its own select members.").

{17} The Legislature expressly recognized that there is no rational basis for treating rural electric cooperatives and public utilities the same as to their rates because a rural electric cooperative is not investor-owned. Section 62-3-2(A)(3) ("Experience has shown that a rational basis exists to provide procedures for setting rates of rural electric cooperatives different from and more limited than those for setting rates of investor-owned utilities."). The Legislature's language in Section 62-3-2(A)(3) echoes this Court's holding that there is not a rational basis for treating rural electric cooperatives and public utilities the same under the PUA—a rationale which also applies to G&T Coops. *See Cmty. Pub. Serv. Co. v. N.M. Pub. Serv. Comm'n*, 1966-NMSC-053, ¶¶ 1, 11, 14, 76 N.M. 314, 414 P.2d 675 (holding that a 1961 amendment to include rural electric cooperatives as public utilities under the PUA denied equal

protection to public utilities because there was no rational basis for giving rural electric cooperatives PUA advantages without subjecting them to full PUA regulation and the requirement to render service to the general public as prescribed for other electric utilities under the PUA); *see also Edington v. N.M. Pub. Serv. Comm'n*, 1964-NMSC-248, ¶ 6, 74 N.M. 647, 397 P.2d 300 (discussing history leading to the 1961 inclusion of rural electric cooperatives as public utilities under the PUA).

{18}     The language of Section 62-8-6 restricting its application to a public utility is significant because a G&T Coop is not investor-owned; the Legislature expressly limited the Commission's powers over utilities that are not investor-owned; and the Commission's only authority over G&T Coops comes from Section 62-6-4, Subsection (D), which the Legislature enacted in its 2000 amendment of Section 62-6-4 without altering the language that restricts application of Section 62-8-6 to public utilities.

{19}     Although Section 62-8-6 makes no textual reference to a G&T Coop, its prohibition against "unreasonable differences as to rates" established by a public utility is a prohibition that applies to G&T Coops as well because Section 62-6-4(D) explicitly authorizes the Commission to "conduct a hearing concerning reasonableness of the [G&T Coop] proposed rates and establish reasonable rates."

12

Obviously, rates incorporating unreasonable differences or discriminations, the focus of Section 62-8-6, would be unreasonable rates under Section 62-6-4(D).

{20} Neither statute prohibits reasonable variations in rates. *See* § 62-8-6 (stating that a public utility shall not grant an "unreasonable preference" or cause an "unreasonable prejudice" in its rate-making); *Albuquerque Bernalillo Cnty. Water Util. Auth. v. N.M. Pub. Regulation Comm'n*, 2010-NMSC-013, ¶ 61, 148 N.M. 21, 229 P.3d 494 ("[Section 62-8-6] does not prohibit variations in rates, nor does it require 'equal service.' Rather, it prohibits 'unreasonable differences' in rates of service between localities. Section 62-8-6 thus forbids arbitrary variations in rates, while permitting variations due to differing costs of service to different areas." (internal quotation marks and citation omitted)).

{21} Although no prior appellate decision has construed Section 62-6-4(D), there is absolutely nothing in the statute or its legislative history to indicate that the Legislature intended to impose a flat ban on reasonable variations in rates. While it is possible that a majority of board members of a cooperative could engage in unreasonable discrimination against minority members and thus engage in unreasonable rate-making, there is no evidence in this record to support a conclusion that Tri-State's board unreasonably discriminated against its minority members.

{22} Section 62-6-4(D) compels the Commission to look at the additional facts surrounding the reasonableness of Tri-State's interim rates, which is the purpose of the required hearing: to give a voice to the nonprotesting members so that the Commission can be fully informed of all members' interests and concerns. As Tri-State points out on appeal, "Because Tri-State is obligated to recover its revenue requirement from its Members, [the Commission's suspension of the 2013 rate design] left an estimated shortfall of over $14 million for New Mexico which would necessarily have to be borne in some fashion by all Members." Tri-State's interim rates were designed to be fair to all of its members because "the Protestors would pay under the old rate design (which they asked for), and the non-Protestors would pay under the new rate design (which they did not protest)."

{23} We conclude that the Order's rejection of ANs 17 and 18 was improper because as a matter of law the interim rates they prescribe are not unreasonably discriminatory and because there is no evidence otherwise of unreasonable discrimination.

**B.      Rejecting the Advice Notices Without a Hearing Violated Section 62-6-4(D)**

{24} Although the Commission's regulations allow it great latitude in managing its own proceedings, the Commission cannot apply its regulations contrary to Section

62-6-4. *See, e.g., Jones v. Emp't Servs. Div. of Human Servs. Dep't*, 1980-NMSC-120, ¶ 3, 95 N.M. 97, 619 P.2d 542 ("If there is a conflict or inconsistency between statutes and regulations promulgated by an agency, the language of the statutes shall prevail. An agency by regulation cannot overrule a specific statute.").

{25}     When the Commission determines just cause in at least three protests of any G&T Coop advice notice, Section 62-6-4(D) requires a Commission hearing on the reasonableness of the protested rates without distinguishing between interim and permanent rates and referring only to "rates" generally. The PUA defines "rate" broadly, stating that a "'rate' means every rate, tariff, charge or other compensation for utility service rendered or to be rendered by a utility." Section 62-3-3(H). Absent further legislative clarification, we take this to mean that the "rate" referred to in Section 62-6-4(D) includes both interim and permanent rates because, as we will discuss, a G&T Coop does not request interim rate relief—it only needs to file new rates with the Commission pursuant to Section 62-6-4(D). We address the Order's two grounds of rejection separately.

**1.     Rejection of Advice Notice 16 Without a Hearing Based on a Prior Suspension of the Same Rates Violated Section 62-6-4(D)**

{26}     The Order concluded that the AN 16 rate prescription for nonprotesting members was "identical" to the suspended AN 15 rate prescription. The Order

15

rejected AN 16 pursuant to the regulation that requires a utility to comply with Commission orders, *see* 17.1.210.11(H) NMAC (stating that the Commission may reject rates, rules, or forms that "are not in substantial compliance with Commission . . . orders"), "because when the Commission suspended the rates [filed under AN 15], it did not limit the suspension to only those rates to be charged to the protesting [members]." On appeal, the Commission states, "Ordinarily, a rate either goes into effect or it is suspended—not in part, but in whole, so that the entirety of the rate and its effects on various customer classes can be evaluated before it is made permanent."

{27}     We recognize that AN 16 tests the Commission's power to enforce its prior order suspending AN 15 in the 2013 rate case. *See* NMSA 1978, § 8-8-4(B)(5) (1998) ("The [C]ommission may . . . take administrative action by issuing orders not inconsistent with law to assure implementation of and compliance with the provisions of law for which the [C]ommission is responsible and to enforce those orders by appropriate administrative action and court proceedings."). Kit Carson describes Tri-State's request for interim rates as an attempt by Tri-State to charge rates on a temporary basis that were previously suspended in the 2013 rate case. We must assume that the 2013 rate case is still pending because Tri-State filed a withdrawal in the 2013 rate case and there is no indication in the record that such a withdrawal

16

has been granted. *See* 17.1.210.11(E) NMAC ("[A] filing which has been made with the Commission may not be withdrawn or changed in any manner without the Commission's approval. Such approval may be granted by the Commission in its discretion."). The Order did not indicate that the Commission intended to consolidate a hearing of the AN 16 interim rate with the hearing of the permanent rate in the 2013 rate case or that AN 16 would be heard at a later time. Because Section 62-6-4(D) applies to both permanent and interim rates, we conclude that this section requires the Commission to grant a hearing of AN 16. The Order was contrary to Section 62-6-4(D) in its rejection of AN 16 without a hearing.

**2.      Rejection of Advice Notices 16, 17, and 18 Without a Hearing Based on Alleged Rule 27 Noncompliance Violated Section 62-6-4(D)**

{28}      The Order rejected ANs 16, 17, and 18 and, having concluded that the advice notices lacked the evidentiary support required by the Commission's regulation establishing that a utility has the burden of supporting its interim rate relief request with evidence, declined to hear them pursuant to Rule 27(A)-(D). Rule 27(A) requires that pleadings for interim relief "must allege such extraordinary facts of immediate and irreparable injury as would justify the [C]ommission's exercise of discretion by granting interim relief prior to a final decision," Rule 27(B) prescribes that the pleading "be accompanied by affidavit or testimony in support of the request," and

17

Rule 27(C) specifies notice requirements. Rule 27(D) authorizes the Commission to forego a public hearing on "requests for interim relief other than interim rate relief." Tri-State referred to interim rates in its letter to the Commission describing ANs 16, 17, and 18, and on appeal Tri-State describes these advice notices as the "rates . . . that would apply only from March to December 2013" pursuant to Section 62-6-4(D) and not Rule 27.

**{29}** We recognize that the Commission's rules of procedure, of which Rule 27 is a part, apply "to all utility division . . . proceedings other than rulemaking[]." 1.2.2.2 NMAC. The Commission's rate-making authority over public utilities "carries with it the incidental and implied power to grant interim rate relief, if the facts warrant" such relief. *U.S. West Commc'ns v. N.M. State Corp. Comm'n*, 1999-NMSC-016, ¶ 16, 127 N.M. 254, 980 P.2d 37 (internal quotation marks and citation omitted). If the Commission suspends the proposed rate change of a public utility for a period of time before the Commission determines the rate, interim rate relief prevents, effectively, the Commission's taking of the property of the public utility without just compensation. *See Mountain States Tel. & Tel. Co. v. N.M. State Corp. Comm'n*, 1977-NMSC-032, ¶¶ 38, 41, 50, 90 N.M. 325, 563 P.2d 588 (explaining that the Commission may approve interim rate relief that applies until it decides the

18

permanent rates to prevent an unconstitutional confiscation of property without due process of law).

{30}    The Commission suggests that the Legislature was aware of the Commission's powers over the interim rates of utilities and must have intended Rule 27 to "fill[] that gap" in Section 62-6-4(D) as to interim rates. The Rule 27 predecessor governing interim rate relief, 17.1.2.30 NMAC (12/31/1998), was in existence before 2000 when Subsection (D) of Section 62-6-4 was enacted. *See* 9 N.M. Reg. 1414 (Dec. 31, 1998). Caselaw imposing the interim rate relief burden existed even earlier than the Rule 27 predecessor. *See, e.g.*, *In re Gas Co. of N.M.*, 28 P.U.R 4th 20, 41 (1978) ("A utility seeking the exercise of this discretion has a heavy burden to bear. . . . The company must demonstrate that the granting of interim rate relief prior to a rate design determination will not unduly burden its customers and if not granted will result in an extreme hardship to the company.").

{31}    The Commission overlooks the fact that interim rate relief is a form of relief from the rate-making powers the Commission exercises over public utilities and not cooperatives. *See, e.g.*, *id.* at 40-41 (stating that the legal basis of interim rate relief comes from the constitutional duty of the Commission to fix interim rates that would minimize the confiscation of the public utility's property but that the Commission has

the discretion to consider whether the interim rate relief proposal is appropriate in the case at hand and to impose the burden on the public utility to show that the rate proposal is appropriate); *Mountain States Tel. & Tel. Co. v. N.M. State Corp. Comm'n*, 1985-NMSC-024, ¶¶ 6, 9-10, 102 N.M. 409, 696 P.2d 1002 (stating that the United States Supreme Court set the standard for determining when a confiscation of a public utility company's property has occurred and affirming the Commission's denial of a public utility request for interim rate relief because the record did not adequately support the public utility's confiscation claim).

{32}    Interim rate relief is a concept unique to public utilities because the only way a public utility can change its rates is by Commission approval. *See* § 62-6-4(A); § 62-8-7(A)-(F). A public utility subject to confiscation of its property without due process may be justified in seeking the Commission's approval of its request for interim rate relief. In contrast, a G&T Coop does not need to seek the Commission's approval for interim rates because a G&T Coop board can agree to a new rate and file that new rate pursuant to Section 62-6-4(D) without requesting interim rate relief under Rule 27. The Legislature would not have necessarily considered confiscation implications of the interim rate relief pleading burden as part of the Commission's authority over G&T Coops because a G&T Coop does not seek such interim rate

relief but instead notifies the Commission of new rates as Section 62-6-4(D) prescribes.

{33}    Our determination here that the Legislature did not intend for the Commission to have rate-making powers over the rates of G&T Coops independent of Section 62-6-4(D) delineates the roles of the statute and Rule 27 in proposals for interim rates and requests for interim rate relief. Section 62-6-4(D) is the only PUA source of the Commission's authority over the rates of a G&T Coop, and the broad references to "rates" in Section 62-6-4(D) do not distinguish between interim and permanent rates. Rule 27(A)-(C) imposes a pleading burden on a utility requesting interim rate relief while G&T Coops under Section 62-6-4(D) do not seek administrative action to set rates in the first place. Unlike public utilities under Section 62-8-7 that must first propose a rate and then obtain the Commission's approval before the rate is effective, the rates of G&T Coops, like rural electric cooperatives, are effective immediately unless suspended under Section 62-6-4(D). If the Commission suspends a G&T rate, interim or not, then the Commission under Section 62-6-4(D) must "conduct a hearing concerning the reasonableness" of the rate; while Rule 27(D) allows the Commission to "act[] upon [a request for interim relief] with or without public hearing." Rule 27(A)-(C) imposes the pleading burden on the utility seeking interim

21

rate relief, *see also* § 62-8-7(A) (imposing a pleading burden on a public utility that seeks the Commission's approval of its rate), while Section 62-6-4(D) does not require a G&T Coop to carry any burden of proof or pleading in order to set its rates.

{34} To the extent that Rule 27 requires a utility to file a request for interim relief as a "complaint, petition, application, or other pleading" with the Commission, Rule 27 is applicable generally; and ANs 16, 17, and 18 are Tri-State's pleadings for interim rates. But Section 62-6-4(D) alone, and not Rule 27, dictates the Commission's authority and its obligations in reviewing any G&T Coop rate "filed in the form of an advice notice," including ANs 16, 17, and 18. Section 62-6-4(D) authorizes the Commission's review of the "reasonableness" of a rate—interim or otherwise—only when the Commission determines, as the Order asserts it did in this case, that at least three G&T Coop members have protested the rate in a showing of "just cause . . . for review." Tri-State incurred no pleading burden because Section 62-6-4(D) imposes a burden on each protesting member to state grounds for its allegation that "the proposed rates are unreasonable," specify the relief it requests, describe its efforts to exhaust remedies for resolution of its dispute of the democratically determined rate, and provide an authorization of the member's protest from the G&T Coop board.

22

{35} Having determined the required showing of "just cause," the Commission was obligated by Section 64-6-4(D) to "conduct a hearing concerning reasonableness" of the rates specified in ANs 16, 17, and 18. The Order was contrary to Section 62-6-4(D) when it rejected ANs 16, 17, and 18 without a hearing.

**C.    We Reject Kit Carson's Mootness Claim and Deny Its Motion to Dismiss the Order**

{36} Kit Carson moved to dismiss Tri-State's appeal of the Order on grounds that the Order was not final and the issues were moot. We write to clarify for future cases the reasons why we did not dismiss this appeal. We recognize that the interim rates are to some extent "identical" to a rate that was already before the Commission and that this bears on whether the Order is final for appeal. And if issues of the rates in ANs 16, 17, or 18 are pending in another proceeding before the Commission, review by this Court would not be appropriate. *See* § 62-11-1 (stating that only "final" orders of the Commission can be appealed to this Court); *B.L. Goldberg & Assocs., Inc. v. Uptown, Inc.*, 1985-NMSC-084, ¶ 3, 103 N.M. 277, 705 P.2d 683 ("For purposes of appeal, an order or judgment is not considered final unless all issues of law and fact have been determined and the case disposed of . . . to the fullest extent possible."). However, we deny the motion to dismiss because the Commission rejected Tri-State's interim rate application and bypassed the hearing requirements of Section 62-6-4(D)

23

when it determined that ANs 16, 17, and 18 failed to meet the Commission's Rule 27 pleading burden for interim rates. The Commission later denied Tri-State's motion for a rehearing of the interim rate case, stating that "[t]his Docket is closed." The Commission, by its own words, made a final determination that the case for Tri-State's interim rates would not be heard because Tri-State's advice notices did not satisfy the burden imposed by the Commission's regulations.

{37}     It is also the repetitive nature of issues such as those in this case that compels us to deny the motion to dismiss this appeal based on mootness. *See Cobb v. State Canvassing Bd.*, 2006-NMSC-034, ¶¶ 23, 29-31, 140 N.M. 77, 140 P.3d 498 (holding that we may review moot cases that either (1) present issues of substantial public interest or (2) are capable of repetition yet evade review); *Howell v. Heim*, 1994-NMSC-103, ¶ 7, 118 N.M. 500, 882 P.2d 541 (affirming a state agency's authority to promulgate a regulation during a finite-term budgetary crisis—even after the crisis in question had passed—because the appearance of similar issues in such time-limited circumstances is subject to repetition); *State ex rel. N.M. Press Ass'n v. Kaufman*, 1982-NMSC-060, ¶ 23, 98 N.M. 261, 648 P.2d 300 (addressing moot issues regarding the right of the media to cover a trial, which concluded before the appellate review of the denial of media access, because similar media access questions would likely

24

rise again in future trials). Tri-State's briefing in this Court represents that it attempted to withdraw the rate design in the 2013 rate case in order to revise rates for 2014, pursuant to AN 19, because it was clear to Tri-State that the Commission "would not permit the 2013 rates to be effective in New Mexico before Tri-State would need to file a new rate to be effective in 2014." Tri-State reported in an October 11, 2013, pleading filed for this appeal that four Tri-State New Mexico members had already filed protests concerning AN 19. This gives us reason to believe that this dispute is repetitive and requires resolution for future guidance in similar situations. The suspension of rates in this case forced Tri-State to set other rates even before a resolution in the suspended-rate case. The Commission could repeatedly characterize Tri-State's subsequent advice notices as requests for interim rate relief and reject them for failure to meet the pleading burden for interim rate relief requests in Rule 27(A)-(C) until this Court clarifies the Commission's authority over the rates of G&T Coops. Accordingly, we conclude that the issues in this case are not moot, and we deny Kit Carson's motion to dismiss.

**III.    CONCLUSION**

{38}    We vacate the Commission's March 13, 2013, Order in Case No. 13-00037-UT and remand for any proceedings that may be necessary in order to comply with this

25

opinion.

{39}    **IT IS SO ORDERED.**

_____

**CHARLES W. DANIELS, Justice**

**WE CONCUR:**

_____
**BARBARA J. VIGIL, Chief Justice**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**RICHARD C. BOSSON, Justice**

_____
**EDWARD L. CHÁVEZ, Justice**

26